**UNITED STATES**

**v.**

**Ronnie A. CURTIS, 511 74 5202, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 87 3856.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 6 Aug. 1987.

Decided 30 June 1989.

LCDR L. Saccoccio, JAGC, USN, Appellate Defense Counsel.

LT. Scott A. Hagen, JAGC, USNR, Appellate Government Counsel.

Capt. Thomas D. Miller, USMC, Appellate Government Counsel.

STRICKLAND, Judge:

Appellant was tried at Camp Lejeune, North Carolina, by a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was found guilty of two premeditated murders, larceny, burglary, unlawful entry, indecent assault and damage to Government property in violation of Articles 118, 121, 129, 130, 134 and 108, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 921, 929, 930, 934, and 908, respectively. Additionally, in accordance with his plea, he was convicted of disobeying a general order in violation of Article 92, UCMJ, 10 U.S.C. § 892. On August 6, 1987, Lance Corporal Curtis was

sentenced to death. The convening authority approved the sentence as adjudged.

We determined that this case presented issues of exceptional importance and, thus, pursuant to Rule 17, Courts of Military Review Rules of Practice and Procedure, decided to hear this case *en banc.*

Appellant raises seven allegations of legal error on appeal. We have carefully considered each assignment of error in this capital case and will discuss each *seriatim.* Having reviewed the record pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866, we conclude that the assignments of error have no merit and that no prejudicial error was committed which affects the findings or sentence.

## I

### Statement of Facts

Appellant, Lance Corporal Ronnie A. Curtis, reported to 3d Battalion, 2d Marines, 2d Marine Division, Camp Lejeune, North Carolina, in January 1985 and was assigned duties as a supply administrative clerk. His officer-in-charge was First Lieutenant James F. Lotz, the battalion supply officer. With the exception of an overseas deployment, Curtis and Lieutenant Lotz worked together in the same office for the next two years.

During this time period, Curtis visited Lieutenant Lotz's quarters aboard Camp Lejeune on several occasions; once for a supply section barbecue and on other occasions to pick up or deliver items related to supply work. As a result, Curtis learned the specific location of Lotz's quarters and, in addition, met Lieutenant Lotz's wife, Joan, who was a school teacher at the high school aboard the base.

Also during this time frame, Curtis, who is black, formed the perception that Lieutenant Lotz was racially prejudiced. This was apparently the result of certain nicknames used by Lotz such as "Bebop Curtis" and "Curtis Blow"; certain imitations of blacks done by Lotz; and, what Curtis perceived to be a different attitude toward and treatment of black Marines in the office. Curtis' perception of prejudice was flatly refuted by black friends and acquaintances of Lotz, including a young black man who lived with the Lotzs and was treated like a son. Nevertheless, it was this perception which apparently led Curtis to the events of April 13 and 14, 1987.[1]

April 13, 1987, was a normal day in the supply section with Curtis going to work at 0730 hours as usual. Lieutenant Lotz was not in the office on this particular day, either in the morning or in the afternoon. Curtis got off work at 1630 hours and proceeded to his barracks room where he and his roommate listened to music for the next several hours. They then purchased a bottle of gin and continued to listen to music and drink mixed drinks for several more hours. During this time, Curtis consumed approximately one pint of gin.

According to Curtis' confessions and testimony, he then went for a walk and began thinking of the things that had been going on in the office and began thinking about Lieutenant Lotz picking on him. As he stood outside of the supply building where he worked, Curtis decided that he needed to kill his officer-in-charge.

Curtis determined he would use a knife to carry out his plan and he broke into the supply building, picked the lock on the security cage and stole a Marine Corps K-Bar knife (a large knife with a seven inch blade). Prior to leaving he damaged the office computer by throwing it on the floor. Next, he went back to his barracks room and obtained a pair of gloves so that he would not leave any fingerprints at the Lotz house. Curtis then stole a bicycle for transportation and, while riding the 1.5 miles to the Lotz home, devised a scheme

---

1. Whether this perception was the actual or only motive for these killings is subject to question. For example, on the night of the murders, Curtis complained to his roommate that Lotz had recently forbidden office personnel from playing games on the office computers, a prac- tice that had previously been tolerated. He expressed his displeasure over this and it may explain the fact that while Curtis was stealing the knife from the supply building he threw his office computer to the floor.

that he knew would get him inside the house.

Curtis arrived at the Lotz home sometime after midnight. He carried the knife concealed in the waistband of his pants. He left the bicycle in the backyard and went to the front door and knocked. Within minutes, Lieutenant Lotz appeared at the door. Curtis acted anxious and told Lotz that another Marine member of the supply section had been in an automobile accident and needed help. Lotz immediately asked Curtis inside and prepared to call the military police. As Lieutenant Lotz picked up the phone to assist one of his Marines whom he believed to be injured, Curtis withdrew the K–Bar from his waistband and stabbed the Lieutenant in the chest. Lieutenant Lotz tried to place a chair between himself and Curtis and called to his wife. Curtis then stabbed Lotz a second time in the back.

Within moments Joan Lotz emerged from the bedroom with a blanket wrapped around her. She first went to her dying husband and then confronted Curtis, kicking him in the shin with her bare foot and asking what they had ever done to him. Curtis then began to attack Mrs. Lotz. As she pleaded with him to stop, he stabbed her seven times in the head, neck and back. Then, as she lay on the floor dying, Curtis ripped and cut off her panties and fondled her vaginal area.

Curtis then searched the house to determine if any other persons were present with the intent that he would kill anyone he found. He rummaged through the house taking car keys and money for gas. He wiped clean the knife he had used in the killings and left the house, taking one of the Lotzs' cars. This car, however, had a standard transmission and Curtis had difficulty driving it so he returned to the crime scene. He thereupon reentered the Lotz home, found some additional money,

checked both bodies and left a second time taking their other car.

He drove around aimlessly for some period of time and ultimately decided to leave town. As he was traveling down the highway, Curtis momentarily fell asleep at the wheel and ended up crashing in the ditch. The state police arrived and, in the course of the accident investigation, Curtis admitted killing the Lotzs. He subsequently made several other confessions to these crimes.

## II

### Military Judge's Instructions

 Appellant's first assignment of error is that the military judge improperly instructed the members as to the voting procedures they had to utilize to adjudge the death penalty. The military judge instructed the members that two votes were required in order to adjudge the death penalty. He instructed that, first, they must unanimously find at least one of the aggravating factors existed beyond a reasonable doubt and, second, they must unanimously find the death penalty to be the appropriate sentence. Appellant argues that, in addition, the members should have been instructed to vote and unanimously find that any extenuating or mitigating circumstances were substantially outweighed by any aggravating factors. This error is without merit because we find that the military judge properly instructed the members in accordance with the requirements of Rule for Courts–Martial (R.C.M.) 1004, Manual for Courts–Martial (MCM), United States, 1984.[2]

This assigned error arises as a result of the wording in R.C.M. 1004(b)(4), MCM, 1984, which states:

> *Necessary findings.* Death may not be adjudged unless—

---

**2.** The appellant does not challenge R.C.M. 1004, MCM, 1984, as a Constitutionally impermissible capital sentencing scheme. In our review of this case, we are satisfied that R.C.M. 1004, MCM, 1984, comports with the mandates of the Supreme Court that the members be required to make "an individualized determination on the

basis of the character of the [accused] and the circumstances of the crime" and that the members "adequately differentiated this case in an objective, evenhanded, and substantively rational way" before imposing the death penalty. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

(A) The members find that at least one of the aggravating factors under subsection (c) existed; .

(B) Notice of such factor was provided in accordance with paragraph (1) of this subsection and all members concur in the finding with respect to such factor; and

(C) *All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances* admissible under R.C.M. 1001(b)(4), including the factors under subsection (c) of this rule. (Emphasis added.)

Appellant asserts that in order for "all members [to] concur" as required by subsection (C), there must first be a vote in which all members unanimously find that the extenuating or mitigating circumstances are substantially outweighed by the aggravating circumstances. At trial, this same argument was made and the military judge, in denying appellant's request for this additional vote, indicated that "he [was] obligated to follow the procedures as set forth by the President." The military judge's ruling that this additional vote was not required is supported by the plain language of R.C.M. 1004(b)(7):

*Voting.* In closed session, before voting on a sentence, the members shall vote by secret written ballot separately on each aggravating factor under subsection (c) of this rule on which they have been instructed. Death may not be adjudged unless all members concur in a finding of the existence of at least one such aggravating factor. After voting on all the aggravating factors on which they have been instructed, the members shall vote on a sentence in accordance with R.C.M. 1006.

■ This subsection requires that only two votes be taken by the members and not the three requested by appellant. The last sentence of this subsection clearly speaks of the aggravating factor determination vote being followed by the sentence determination vote with no discussion or provision for an intermediate vote.

The absence of a requirement for a vote as to the balancing test does not relieve the members of their obligation to perform this test, it merely does not require that they memorialize the specific result. Appellant argues that without such memorialization there is no way to determine if all the members concurred that any extenuating or mitigating circumstances were substantially outweighed by any aggravating factors. We do not agree.

R.C.M. 1004(b)(6) requires that the military judge instruct the members as to the "requirements and procedures" they must use to adjudge a death sentence, including instructions regarding the balancing test. We believe the military judge's instructions were in compliance with this provision. In his instructions, the military judge outlined a three-step procedure to be followed before a death sentence could be adjudged. These involved a determination of whether an aggravating factor existed, application of the balancing test and a consideration of whether death was appropriate. With respect to step two the judge instructed, in pertinent part:

... [y]ou may not adjudge a sentence of death *unless* you find that any and all extenuating or mitigating circumstances are substantially outweighed by any aggravating factors as you have found existed in the first step of this procedure. (Emphasis added.)

The military judge thereafter instructed with respect to step three: "A sentence of death may be adjudged only upon the unanimous vote of all the members."

In following the judge's instructions (given orally, with written copies provided to the members), the members could only have voted for death after first finding that the extenuating or mitigating circumstances were substantially outweighed by any aggravating circumstances. Thus, it is implicit in the recorded, unanimous vote for the death penalty that each member properly applied the balancing test. No further memorialization is necessary. Therefore, we hold that the military judge properly instructed the members as to the number of votes which are required by R.C.M. 1004, MCM, 1984.

Included in this assignment of error is the allegation that the military judge overemphasized the requirement that the members were required to unanimously concur in finding an aggravating factor, but underemphasized the requirement that the members could not adjudge a death sentence unless they all first concurred in the finding that any extenuating or mitigating circumstances were substantially outweighed by any aggravating circumstances. Appellant argues that because the military judge instructed on the first requirement seven different times but only mentioned the second requirement once, the members did not fully and fairly evaluate the evidence but instead adjudged the death penalty in a meaningless manner. We disagree.

Merely mentioning one requirement more than another during instructions does not alone constitute error. There must also be some indication that this resulted in the members improperly performing their duties. There is no such indication in this case. To the contrary, all indications are that the members properly deliberated according to the judge's instructions. Not only did the military judge in this case orally instruct the members, he also provided them written copies of the instructions. If the members had any questions or were confused as to the instructions given by the military judge they could have referred to their copies for clarification. Furthermore, if the members were still confused or did not understand the instructions even after referring to their copies, then they could have requested further clarification from the military judge in open court. However, because the members did not request further clarification in open court and because they could easily refer to their copies of the instructions, we are convinced that the members were neither misled nor misinformed as to their duties in adjudging an appropriate sentence. Accordingly, appellant was provided a fair and full evaluation of all the evidence pursuant to R.C.M. 1004, MCM, 1984, which guaranteed meaningful deliberations by the members prior to the imposition of the death sentence.

## III

### Presidential Promulgation of R.C.M. 1004

The procedures followed in this capital case in ultimately adjudging the death penalty were those set forth in R.C.M. 1004, MCM, 1984. R.C.M. 1004 was promulgated by the President as a part of MCM, 1984 and became effective 1 August 1984.[3] Appellant contends that the sentencing procedures are invalid because the President exceeded the power delegated to him by Congress under Article 36, UCMJ, 10 U.S.C. § 836, in that the rule is substantive in nature and not procedural.

Judge Albertson, in her dissent, agrees with this proposition, but goes even further in finding fault with the death penalty provisions of MCM, 1984. It is her position that Article 118, UCMJ, has been invalidated as unconstitutional as a result of the United States Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Alternatively, she argues that the President impermissibly encroached on the legislative powers of Congress in promulgating R.C.M. 1004 or, if the delegation could be construed as permissible, Congress failed to provide sufficient specific guidelines to prevent the President from acting arbitrarily.

We disagree with these arguments and find that Article 118, UCMJ, has not been rendered unconstitutional and that the Presidential promulgation of R.C.M. 1004 was legally valid.

### A.

We turn first to an analysis of the post *Furman* status of Article 118, UCMJ. In *Furman* and its progeny, the Supreme Court struck down various state death penalty statutes as violating the Eighth Amendment because sentencing authorities were permitted to exercise uncontrolled dis-

---

**3.** It was subsequently amended by Executive Order No. 012550 of 19 February 1986 (MCM, 1984, change no. 2).

cretion in determining whether to impose the death sentence. As Judge Albertson points out, the dissenters in *Furman* speculated as to the effect the decision might have on other existing state and federal statutes, including the Uniform Code of Military Justice. This speculation, however, was simply dicta and in no way directly affected any other statute, including the capital sentencing provisions of Article 118, UCMJ. The decision that did affect these provisions was handed down by the United States Court of Military Appeals in *United States v. Matthews*, 16 M.J. 354 (C.M.A. 1983). As a result, we must turn to *Matthews* to determine the status of Article 118, UCMJ.

■ In *Matthews*, the Court of Military Appeals held that the death sentencing procedures employed by courts-martial in capital cases were defective because of the failure to require the court members to make specific findings as to individualized aggravating circumstances which could be factually and legally reviewed on appeal. *Id.* at 380. This holding did not invalidate Article 118, UCMJ, as being unconstitutional. Instead, it merely found that the *procedures* utilized in imposing the death sentence were constitutionally inadequate. The Court recognized Congress' intent that the death penalty be a sentencing option only for certain offenses, including premeditated murder, *id.* at 380, and the Court noted the effect their ruling would have:

> Our ruling in this case ... creates a void which must be filled promptly in order to effectuate the congressional intent that court-martial members have the option of imposing a death sentence for certain crimes.

*Id.* at 381.

However, the Court further specifically recognized the continuing vitality of Article 118 by setting forth two alternative means to remedy the deficiencies of the sentencing procedures, neither of which required that Congress reaffirm its intent that the death penalty be authorized for premeditated murder. *Id.* at 380, 381. Congressional intent that the death penalty exist as a permissible sentence for premeditated mur-

der was in no way thwarted nor invalidated by *Matthews*. We find no holding of any court which has invalidated Article 118 as unconstitutional.

## B.

■ The effect of *Matthews* was to prohibit the imposition of the death penalty until the procedural defect found by the Court was remedied. The Court noted that the action to remedy this defect could either be taken by Congress or the President. *Id.* at 380. Corrective action was taken by the President when R.C.M. 1004 was promulgated as a part of MCM, 1984. The issue is whether this promulgation was legally valid.

Congress has delegated several of its powers with respect to the UCMJ to the President. Article 56, 10 U.S.C. § 856 delegates the power to set maximum punishments for certain courts-martial offenses and Article 36 delegates the power to prescribe rules. Article 36, UCMJ, provides, in pertinent part:

> (a) Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial ... may be prescribed by the President by regulations which shall ... apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.

> (b) All rules and regulations made under this article shall be uniform insofar as practicable and shall be reported to Congress.

To determine whether the promulgation of R.C.M. 1004 properly falls within this provision we first look to the Court of Military Appeals discussion in *Matthews.* When indicating that corrective action could be taken by the President in his capacity as Commander-in-Chief under Article II, Section 2, of the Constitution, and pursuant to the power delegated to him by Congress, the Court stated:

> Pursuant to Article 36 of the Uniform Code, the President promulgates rules to

govern pretrial, trial, and post-trial procedures of courts-martial. Unlike other Federal criminal statutes, the punitive articles of the Uniform Code for the most part authorize punishment "as a court-martial may direct"; no maximum or minimum sentence is specified. However, as contemplated by Article 56 of the Uniform Code, 10 U.S.C. § 856, the President prescribes maximum punishments for the various offenses....

The great breadth of the delegation of power to the President by Congress with respect to court-martial procedures and sentences grants him the authority to remedy the present defect in the court-martial sentencing procedure for capital cases....

*Id.* at 380, 381.

It is certainly clear from this language that the Court believed it was well within the President's power, as delegated to him by Congress, to promulgate these procedures.[4]

The Court's analysis that the sentencing defects were procedural in nature, and thus within the President's power to correct, is consistent with the Supreme Court's holding in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In *Dobbert*, the death penalty statute in effect at the time the defendant committed murder was struck down as violative of the holding in *Furman*. Prior to the defendant's trial, however, a new death statute was enacted. The question was whether the changes in the new statute were procedural in nature, thus allowing it to be retroactively applied against the defendant, or substantive, thereby prohibiting retroactive application based on the constitutional prohibition against *ex post facto* laws. *See* U.S. CONST. art. I, § 10.

The original statute provided that a person convicted of a capital offense would be punished by death unless the jury recommended mercy. The revised statute established, *inter alia*, a bifurcated sentencing

proceeding, a specific enumeration of aggravating circumstances, an opportunity to present relevant evidence of mitigating and aggravating circumstances, a test to balance mitigating circumstances against aggravating circumstances and procedures to review any death sentence imposed. In concluding that these changes were procedural and that there was no *ex post facto* violation, the Court stated:

> ... [t]he change in the statute was clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime.

*Dobbert*, 432 U.S. at 293, 294, 97 S.Ct. at 2298, 53 L.Ed.2d at 356.

The Court further supported the conclusion that the change was procedural by quoting from *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), as follows:

> The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute.

*Dobbert*, 432 U.S. at 294, 97 S.Ct. at 2298, 2299, 53 L.Ed.2d at 357.

R.C.M. 1004 established capital sentencing provisions which are similar to the statutory changes in *Dobbert*. R.C.M. 1004 sets forth aggravating factors, one or more of which must be found before death may be considered; provides a notice requirement concerning these factors; provides broad latitude to present evidence in extenuation and mitigation; establishes voting procedures; and provides for necessary findings, including a balancing test, as a prerequisite to adjudging a death sentence. As in *Dobbert*, R.C.M. 1004 simply altered the methods employed in determining whether the death penalty was to be imposed. Thus, we reach the same conclu-

---

4. The Court of Military Appeals belief that the President has the power to promulgate these procedures is also consistent with the Court's holding in *United States v. Flucas*, 49 C.M.R. 449 (C.M.A.1975), where the Presidential promulgation of a Manual provision was found to be valid which added the element of knowledge in assault cases where this element was provided as an aggravating factor increasing the maximum permissible punishment.

sion as the Court in *Dobbert* as to the nature of these provisions. We find that the changes in the capital sentencing scheme brought about by the provisions of R.C.M. 1004 are clearly procedural.

### C.

 The next question is whether such a promulgation is contrary to the intent of Congress. We analyze this from two perspectives. First, Article 36(b) requires that the President report to Congress when rules and regulations are made. In accordance with this provision, copies of the Executive Orders promulgating R.C.M. 1004 as a part of MCM, 1984, and the subsequent modification to R.C.M. 1004 were transmitted to Congress. 130 Cong.Rec. H–7611 (daily ed. July 23, 1984) (EC–3679); *id.* S–9217 (daily ed. July 25, 1984) (EC–3579); and 132 Cong.Rec. H–1022 (daily ed. March 11, 1986) (EC–2959); *id.* S–2355 (daily ed. March 10, 1986) (EC–2667). Thereafter, no Congressional objection to R.C.M. 1004 was voiced and, consequently, tacit approval of these procedures can be inferred. Second, and more important, is the Congressional intent reflected in the passage of Public Law 99–145, Title V, § 534(a), Nov. 8, 1985, 99 Stat. 634, which amended the Uniform Code of Military Justice by establishing espionage as a capital offense under Article 106a, UCMJ, 10 U.S.C. § 906a. This article creates certain aggravating factors which the members must unanimously find beyond a reasonable doubt in order to adjudge a sentence of death. In addition, it provides specific recognition of the President's power to delineate aggravating factors for a capital offense, as follows:

> (4) Any other factor that may be prescribed by the President by regulations under section 836 of this title (Article 36).

Article 106a(c)(4), UCMJ, 10 U.S.C. § 906a.

Furthermore, in considering the legislative intent associated with this act we note the following:

> The conferees did, however, adopt a statutory formulation of capital sentencing standards for espionage cases and intend that those standards be implemented in a manner consistent with the provisions of Rule for Courts–Martial 1004 of the Manual for Courts–Martial, 1984. The conferees do not intend that the enactment of statutory capital sentencing standards for the new Article 106a be construed as affecting the validity of the regulatory capital sentencing standards that already exist for the other capital punitive articles.

Department of Defense Authorization Act of 1986, Pub.L. No. 99–145, 1985 U.S.Code Cong. & Admin.News pp. 472, 579.

This legislative intent evidences a clear ratification of the Presidential action in promulgating R.C.M. 1004. This, combined with the statutory provision allowing the President to establish aggravating factors and the tacit approval of R.C.M. 1004, convinces us that Congress does not believe that the President has encroached on its legislative prerogative in this matter.

### D.

 The only remaining question is whether, in spite of the beliefs of the Court of Military Appeals, the President, and Congress, promulgation of this rule is nevertheless constitutionally flawed because the Congressional delegation of power to the President under Article 36, UCMJ, is violative of the principle of separation of powers.[5] The Supreme Court has long recognized that Congress generally cannot delegate its legislative powers to another branch of Government. *Field v. Clark*, 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed. 294, 310 (1892). Nevertheless, they have recognized that this prohibition does not prevent Congress from acquiring the assistance of other branches. *J.W. Hampton, Jr. & Company v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624, 629 (1928). In *Hampton*, the Court indicated:

> In determining what it may do in seeking assistance from another branch, the ex-

---

**5.** U.S. CONST. art. I, § 1 provides that legislative powers shall be vested in the Congress of the United States.

tent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental coordination.... Congress has found it ... necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion ... to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations.

*Id.* (Citations omitted).

As a result, many Congressional delegations of power have been upheld. *See, e.g., Mistretta v. United States,* — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (upholding delegation to the United States Sentencing Commission of the power to promulgate binding sentencing guidelines for federal offenses); *Lichter v. United States,* 334 U.S. 742, 785–786, 68 S.Ct. 1294, 1316–1317, 92 L.Ed. 1694, 1725–1726 (1948) (upholding delegation to Secretary of War and other administrative officials of the authority to determine excessive profits); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 600, 64 S.Ct. 281, 287, 88 L.Ed. 333, 344 (1944) (upholding delegation of authority to Federal Power Commission to determine just and reasonable rates).

The Supreme Court has upheld Congressional delegation of authority where it "is sufficiently specific and detailed to meet constitutional requirements", *Mistretta,* — U.S. at —, 109 S.Ct. at 655, and where "Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103, 116 (1946). In her dissent, Judge Albertson argues that Article 36, UCMJ, fails to meet these requirements, particularly as to establishing specific standards to prevent the President from acting arbitrarily. We do not agree.

Article 36, UCMJ, delineates the general policy to prescribe pretrial, trial, and post-

trial procedures for cases tried by courts-martial. It states that the authority is delegated to the President, and, most importantly, it *does* establish specific boundaries to limit the President's action under this provision. The President, in prescribing these procedures, is bound to apply the principles of law recognized in criminal trials in the United States district courts. Consequently, he does not have unfettered discretion to do as he pleases. Rather, he may not act arbitrarily and he must follow the law. He is subject to an additional check in that he must report all rules and regulations made under this article to the Congress.

The President's action in promulgating R.C.M. 1004 falls squarely within the specific and detailed boundaries of his authority. R.C.M. 1004 complies not only with the legal principles of the United States district courts, but also with those of the United States Supreme Court. *See Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). We find no defect, constitutional or otherwise, in the promulgation of this rule.

IV

Equal Protection

Appellant alleges that he has been denied his right to the equal protection of the law and to be free from cruel and unusual punishment because as a member of the armed forces he has been sentenced to death when this punishment is not available for murder tried in federal civilian courts. The appellant's assertion that his rights under the Fifth and Eighth Amendments have been violated by Congress' decision to make the death penalty available for violations of Article 118, UCMJ, and the President's promulgation of the procedures in R.C.M. 1004, MCM, 1984, for the imposition of the death penalty, is without merit.[6]

---

6. The Eighth Amendment is violated when the

death penalty is carried out in barbaric or inhu-

The Court of Military Appeals has held that not every distinction or varied treatment of military personnel made by the Government violates equal protection guarantees of the Constitution. *United States v. Means*, 10 M.J. 162, 165 (C.M.A. 1981). It is only when the distinction or treatment becomes unjustifiable discrimination that a service member's due process rights to the equal protection of the laws are implicated. *United States v. Rodriguez–Amy*, 19 M.J. 177, 178 (C.M.A.1958); *United States v. Larner*, 1 M.J. 371, 375 (C.M.A.1976). In order to determine when a distinction or treatment is justifiable it is necessary to first examine whether the Government has utilized constitutionally suspect classifications such as race, religion, or national origin, or whether the Government is encroaching on fundamental constitutional rights. If neither suspect classifications nor fundamental constitutional rights are involved, then the Government's varied treatment of service members need only have a reasonable or rational basis. *Means*, 10 M.J. at 165.

Appellant has alleged that his fundamental right to life is encroached by the Government's decision to make the death penalty a permissible sentence for service members and, therefore, a higher standard of scrutiny should be utilized than the rational basis test for determining whether he has been denied equal protection of the law. This particular issue is of first impression in military law and we will look to federal case law for precedent. The Fifth. Circuit Court of Appeals has twice examined this exact issue. In *Gray v. Lucas*, 677 F.2d 1086 (5th Cir.1982), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983), the Court held that the presence of a death penalty in a criminal statute does not encroach on a fundamental right so as to trigger a heightened level of scrutiny. The Fifth Circuit based its decision on the Supreme Court's reasoning in *Gregg v.*

*Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

In *Gregg*, the Supreme Court reasoned that because of the complex issues involved in determining the moral values of society and the social utility of the death penalty, it is particularly within the province of the legislature to establish the degree of punishment for certain classes of crimes. Therefore, the Court reasoned that the decision to authorize the death penalty for certain classes of crimes should not be upset by the courts unless it is "clearly wrong." *See Gregg*, 428 U.S. at 186–188, 96 S.Ct. at 2931, 49 L.Ed.2d at 882. Accordingly, it was held in *Gray v. Lucas* that equal protection challenges to a death penalty scheme should be analyzed under a rational basis test, and not the heightened level of scrutiny which appellant urges. This holding was later reaffirmed in *Williams v. Lynaugh*, 814 F.2d 205 (5th Cir.1987), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987).

The legal reasoning in *Gray v. Lucas* and *Williams v. Lynaugh* is sound and we will, therefore, analyze appellant's equal protection challenge to R.C.M. 1004, MCM, 1984, according to the rational or reasonable basis test. *But cf. Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (the punishment of sterilization was held to encroach upon the fundamental right of procreation).

Congress had a rational basis for deciding to authorize the death penalty for a violation of Article 118 and to delegate to the President the task of promulgating the procedures to impose this punishment on service members. Service members, because of their mission to wage war, may need the more stringent deterrent of capital punishment to ensure discipline. It is the necessity to secure from service members "prompt obedience to lawful orders and the maintenance of the orderliness and

mane method or if it is excessive in relation to the crime committed. *See Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Gray v. Lucas*, 677 F.2d 1086 (5th Cir.1982). Since the appellant has not factually developed the method in which naval personnel are to be

executed and since the question of whether the death penalty is proportionate to appellant's crime is fully discussed in section VIII, we will analyze this allegation of error pursuant to the due process clause of the Fifth Amendment.

**1086**

self-discipline necessary to the effective operation and control of an armed force in combat" that precipitated the establishment of the UCMJ as a disciplinary system. *United States v. Van Steenwyk*, 21 M.J. 795, 801 (NMCMR 1985). It is because "the military is by necessity, a specialized society separate from civilian society" that civilian definitions of "criminal law" cannot be applied to establish the parameters necessary to maintain military discipline. *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439, 450 (1974). Therefore, it is reasonable for Congress to ensure military discipline by providing a heightened punishment for a breach of military criminal law than would be authorized for similar breaches of federal civilian criminal law.

It is also reasonable for Congress to address the potential fears that the civilian community may have towards maintaining a professional and permanent fighting force by authorizing death for certain heinous crimes, such as murder. Clearly, a rational basis exists for the federal Government to distinguish civilians convicted of murder from federally trained and government sponsored military members convicted of murder and to legislate a different form of punishment for these two classes of criminals. Thus, we find the appellant's equal protection challenge to the punishment of death for a violation of Article 118 and to the procedures as set forth in R.C.M. 1004 to be without merit.

## V

### Challenge For Cause

After lengthy *voir dire*, one of the prospective members, Captain Emerson, was challenged for cause by the Government. The Government based its challenge on the case of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), arguing that because of his religious upbringing and beliefs, Captain Emerson could never, under any circumstance, vote

to impose the death penalty. The military judge granted the Government's challenge for cause, stating:

I believe that he would not have any difficulty in voting for a finding of guilty which would automatically result in a penalty of death. But in this case I think it it clear to the military judge that he does have an inelastic attitude as described for—to voting in *U.S. v. Rojas*, [15 M.J. 902 (NMMR 1983)] and although he used the words that he would consider, I don't think that that consideration would be a meaningful one anyway, and that, notwithstanding his sincerity, he would be compelled to vote for the alternate punishment.

Appellant asserts that the military judge erred in granting this challenge for cause. He contends that the military judge's reliance on *Witherspoon* and *United States v. Rojas*, 15 M.J. 902 (NMCMR 1983), was misplaced and that a new standard exists which would not have excluded Captain Emerson. Appellant is correct to the extent that the standard applicable to this challenge is the one set forth in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). However, we find that the military judge considered *Adams* in making his ruling and that Captain Emerson's views concerning capital punishment permitted his challenge under this standard. Thus, appellant's contention is without merit.

■ In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court reaffirmed that *Adams v. Texas* established the proper standard for determining when prospective jurors may be excluded for cause because of their views on capital punishment.[7] *Adams* permits a juror to be challenged for cause when his views about capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Wainwright,*

7. In reaffirming this standard, the Court noted that the genesis for excusing jurors in capital cases was to prevent the state's legitimate interest in administering constitutional capital sentencing schemes from being frustrated. *Wainwright,* 469 U.S. at 423, 105 S.Ct. at 851, 83 L.Ed.2d at 851.

469 U.S. at 423, 105 S.Ct. at 851, 83 L.Ed.2d at 851. This standard abolishes the *Witherspoon* reference to "automatically" voting against the death penalty, thereby dispensing with the requirement that a juror could only be excluded if he would never vote for death. In addition, it eliminates the extremely high burden of proving that a juror's bias is "unambiguous" or "unmistakably clear". *Id.* 469 U.S. at 423, 424, 105 S.Ct. at 851, 852, 83 L.Ed.2d at 851, 852.

In applying this standard in *Wainwright,* the Supreme Court upheld the trial judge's excusal for cause of a juror who stated that her beliefs concerning the death penalty would interfere with her sitting as a juror. In so finding, the court gave great deference to the trial judge's findings as long as the findings were fairly supported by the record regardless of whether a reviewing court might disagree with these findings. The Court noted:

> ... determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.

469 U.S. at 434, 105 S.Ct. at 857, 83 L.Ed.2d at 858, citing *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

The Supreme Court similarly applied the *Adams* standard in *Lockhart v. McCree,*

476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), and upheld the removal of eight jurors for cause prior to the guilt phase of a bifurcated trial. In that case, the trial judge removed for cause eight of the jurors who stated that they could not under any circumstance vote for the imposition of the death penalty.

In this case, Captain Emerson was thoroughly questioned by both counsel and the military judge. He indicated that he had definite reservations concerning the death penalty. These reservations were founded on his religious teachings and belief that only God could take a life. Captain Emerson appeared to be quite ambivalent during the initial portion of the *voir dire* as to how his beliefs might affect his ability to sit as a member and adjudge a sentence.[8] Subsequently, however, his feelings became much more focused, particularly after he realized that he had another option available during sentencing other than death:

DC: Well, I'm a little confused because it seems to me that you're saying two things at the same time. Are you saying that it's your religious belief that it's an extremely difficult thing to do, to vote for a death penalty?

MEM(CAPT EMERSON): Yes, sir.

DC: And at the same time you're saying that, yes, because of my obligation as a military officer, I could consider it and I could do it?

MEM(CAPT EMERSON): I could consider it, but once again I stated that if there is another option that I would probably sway towards the other option.

R. 167, 168.

TC: So you, under no circumstances, because of your religious beliefs could vote for a penalty of death regardless of the facts and circumstances of the case?

MEM(CAPT EMERSON): Yes, sir.

TC: You could consider it, but you could not vote for it?

MEM(CAPT EMERSON): Yes, sir.

TC: Because of your religious beliefs?

---

8. It is clear from the record that Captain Emerson's religious beliefs would not have interfered with his ability to determine guilt or innocence during the findings phase of the trial.

**1088**

MEM(CAPT EMERSON): Yes, sir.

TC: And that's the truth from the bottom of your heart, is it not?

MEM(CAPT EMERSON): Yes, sir.

TC: Captain Emerson?

MEM(CAPT EMERSON): When he asked me do I consider it, I said "I'd consider it." But once again, I will always go with the other option.

R. 169.

MJ: Now, considering the prefatory remarks of Major Boyett, we got to the point in which you were called upon to cast your vote either for the death penalty or for the other alternative punishment. Do I correctly understand that you would in all events cast your vote for the alternative punishment?

MEM(CAPT EMERSON): Yes, sir.

R. 173.

The foregoing testimony clearly illustrates that Captain Emerson's beliefs would affect his ability to adjudicate a sentence in that he would always choose an alternative other than death even though he would "consider" death. We agree with the military judge that this "consideration" would not be a meaningful one.

We must now examine Captain Emerson's responses in light of the *Adams* test to determine whether his exclusion for cause was proper. We initially note that, contrary to appellant's assertion, the military judge did not rely solely on *Witherspoon* and *Rojas* in ruling on this challenge. In fact, following a recess toward the end of *voir dire*, he compared Captain Emerson's responses specifically with the *Adams* and *Lockhart* cases.

We give deference to the military judge's determination of Captain Emerson's views based on his personal observation of Captain Emerson and conclude that it is fairly supported by the record. We find that if Captain Emerson had been allowed to serve as a member in this case he would have effectively frustrated the Government's legitimate interest in administering its constitutionally valid death penalty scheme by always voting for an option other than death regardless of the circumstances. We find that Captain Emerson's views would

have prevented or substantially impaired the performance of his duties as a juror in accordance with his instructions and his oath. The excusal of Captain Emerson for cause was proper.

## VI

### Denial of Right to a Panel of Fair and Impartial Members

 Appellant made a motion for appropriate relief at trial asserting that his Sixth Amendment right to an impartial jury had been violated in that the members selected by the convening authority did not represent a cross section of the community. This same issue is raised on appeal and, in addition, appellant contends that even if the Sixth Amendment is inapplicable to courts-martial, he nevertheless was denied his due process right to be tried by members with fair and open minds whose impartiality could not be reasonably questioned. We find no merit to either contention.

In support of his motion, appellant called a clinical psychologist to testify. The witness was qualified as an expert in behavioral psychology. As to foundational matters, the psychologist testified that he was aware of the fact that appellant was alleged to have murdered a Marine officer and his wife, that he had reviewed the convening orders and modifications, and was aware of the composition of the prospective membership of the court. The psychologist testified that he was concerned that the officer members would not be totally impartial and objective because of their higher likelihood of identifying with the victim, who was also an officer. He proposed that the situation could be remedied by selecting the prospective members at random. No inquiry was made of the psychologist as to the ability of an officer chosen at random to be impartial and objective. Subsequently, the members were extensively questioned in *voir dire* and, as appellate defense counsel concedes in his brief, the officer members who ultimately decided the case gave no specific responses during *voir dire* which indicated any inability to be impartial. It is also

significant to note that the assistant defense counsel acknowledged to the military judge that there was no indication that the convening authority had failed to comply with Article 25, UCMJ, 10 U.S.C. § 825.[9]

Congress has specifically prescribed in Article 25, UCMJ, the qualifications for service as a member of a courts-martial. It provides in pertinent part:

> [T]he convening authority shall detail as members thereof such members as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.

The Court of Military Appeals has noted on several occasions that the Sixth Amendment right to a jury composed of a representative cross section of the population does not apply to courts-martial and, in fact, Article 25 contemplates otherwise. *See United States v. Santiago–Davila*, 26 M.J. 380 (C.M.A.1988); *United States v. McClain*, 22 M.J. 124 (C.M.A.1986).

We consider unpersuasive the appellant's argument that the testimony of his expert, standing alone, was sufficient to dismiss the members.

■ The record contains nothing at all to support appellant's conclusion. The expert testified in advance of *voir dire* and expressed a "concern" that the officer members might identify with the victim and therefore be partial. This "concern" was wholly unsubstantiated by specific responses of prospective officer members during *voir dire*. While the expert had testified in numerous trials, he admitted that this was the first time he had expressed an opinion on this particular issue. Finally, his remedy to resolve the situation—to randomly select members from the command—leaves open the distinct possibility that the officers chosen in this manner might have the same inclination to identify with the victim. His remedy in no way seeks to exclude officers entirely from the panel [10] which would logically resolve his

concern, but merely offers an alternative method for selecting prospective members than is set forth in Article 25. The proposed remedy is inconsistent with the psychologist's own opinion and detracts from its validity. We find nothing to support the allegation that the officer members might not be impartial. To the contrary, the record is replete with assurances by the members that they would follow the law and give appellant a fair trial. The military judge correctly denied this motion for appropriate relief.

## VII

### Peremptory Challenge

At the conclusion of *voir dire*, Government counsel peremptorily challenged Staff Sergeant Edwards, a black, who is of the same racial group as appellant. Defense counsel objected on the basis that the peremptory challenge was used in a discriminatory manner, but the objection was ultimately overruled by the military judge. Appellant contends that the military judge erred in this ruling, thereby denying his right to equal protection of the law.

■ The Supreme Court has held that a defendant has the right to be tried by a jury from which no "cognizable racial group has been excluded" and, thus, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79 at 89, 106 S.Ct. 1712 at 1719, 90 L.Ed.2d 69 at 83 (1986). This right to equal protection is part of due process under the Fifth Amendment and applies to trials by Courts–Martial. *United States v. Santiago–Davila*, 26 M.J. 380 (C.M.A.1988). *See also United States v. Shelby*, 26 M.J. 921 (NMCMR 1988).

---

9. This is uncontested on appeal.

10. While an accused is not entitled to a panel composed of entirely enlisted personnel, Article 25 does not preclude such a result. It merely

requires that *at least* one-third of the members be enlisted when the accused has made a request for enlisted members.

■ *Batson* provides that once the defendant makes a prima facie showing of purposeful discrimination in the Government's use of the peremptory challenge, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. A prima facie case is established when the defendant shows that he is a member of a cognizable racial group; that the prosecutor exercised peremptory challenges to remove members of defendant's racial group; and, that these facts and any other relevant circumstances raise an inference that the use of these challenges was to purposely exclude jurors because of race. This inference is based on the totality of the circumstances and such things as a "pattern" of strikes of members of a racial group or the prosecutor's questions and statements during *voir dire,* may be considered. *Batson,* 476 U.S. at 96, 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

■ It is insufficient to rebut the prima facie case by a mere assertion of the prosecutor that he was properly performing his duties and had no discriminatory motive for his challenge. It is not, however, necessary for the neutral explanation to rise to the level that would justify a challenge for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1722, 1723, 90 L.Ed.2d at 88. In *Batson,* the case was remanded because the prosecutor used his peremptory challenges to remove all four black persons on the venire which resulted in the defendant, also black, being tried by an all white jury.

In *Santiago–Davila,* the accused was of Hispanic descent and the court members selected by the convening authority consisted of ten officer and enlisted members, two of whom had Hispanic surnames. Following *voir dire,* the Government peremptorily challenged one of the Hispanics and the military judge allowed the challenge to stand in spite of an objection by defense counsel. The military judge offered trial counsel an opportunity to state a reason for the challenge but trial counsel declined to do so and the military judge did not require that a reason be given. In remanding *Santiago–Davila,* the Court of Military Appeals found that a prima facie case of purposeful discrimination had been established which required that a neutral explanation be given. The Court was not persuaded by the fact that one Hispanic remained on the panel, and it was of particular importance that they found an absence of anything in the *voir dire* or anywhere else in the record to clearly indicate anything other than race as a motive for the challenge. *Santiago–Davila,* 26 M.J. at 391.

Turning to the case *sub judice,* the court selected by the convening authority consisted of nine officers and six enlisted members. Of these, six were black. One black officer was successfully challenged for cause by the defense because he knew Lieutenant Lotz and was Lotz's superior in the chain of command. Another black officer, Captain Emerson, was also challenged for cause by the Government for the reasons discussed in a prior assignment of error. The Government further successfully challenged for cause a white officer without objection and the defense similarly challenged for cause two more white officers. Thus, at the time the Government exercised its peremptory challenge against Staff Sergeant Edwards, the panel consisted of four officers and six enlisted persons, four of whom were black. The final racial composition of the court was six whites and three blacks (one officer and two enlisted).

During *voir dire,* trial counsel initially experienced some difficulty in ascertaining that Staff Sergeant Edwards understood the concept of the government's burden to establish guilt beyond a reasonable doubt and required assistance by the military judge in defining terms. Thereafter, the *voir dire* appeared to proceed smoothly without revealing anything of particular significance until the following relevant exchange occurred:

TC: I'll just ask one general question, Staff Sergeant. How do you feel about, again, being—sitting here as a member in this case? Your own words.

MEM(SSGT EDWARDS): I feel, sir, basically that it would be to me a learning

experience. And coming in with an open mind, being able to give everything, weighing out everything, and listening to all the facts before I finally say whether a person is innocent or guilty, it would be a good experience for me and something that I would like to go through, sir.

TC: You'd also agree that not—it's not only would be a learning experience, it would be a very, very serious responsibility?

MEM(SSGT EDWARDS): Yes, sir.

TC: Possibly one of the more serious responsibilities in your whole life?

MEM(SSGT EDWARDS): Yes, sir.

This concluded the *voir dire* of Staff Sergeant Edwards and he was subsequently peremptorily challenged by the Government. Defense counsel made a timely objection and requested that the government state the reason for the challenge. At the time, because *Santiago–Davila* had not yet been decided, the military judge and counsel recessed and considered the ruling in *Batson.* Thereafter, the military judge and trial counsel believed it would be best for trial counsel to state the reason for his challenge. There was no discussion or finding as to whether a prima facie case of purposeful discrimination had been established. The defense counsel expressed his concern as follows:

DC: Now, it strikes the defense that the government has known for some three and a half months that this case involved a defense theory which potentially would involve racial prejudice. As I remember the answers of Staff Sergeant Edwards, he met all legal criteria to be a member. No one had any objection to him for cause or anything like that. And it strikes the defense as rather strange at this particular point in time that the government is using its one peremptory challenge to take a black man off this jury. Of course, there's nothing that I can point to which proves that it's racially motivated in any particular form, fashion, or manner because I can't look in the minds of the prosecution. But it essentially gives a bad flavor to the whole thing and it's the position of the defense

that we should not only be worried about actual fact, but impression and how it looks as well because the court is, after all, essentially, an instrument which is supposed to arrive at fairness.

The military judge discussed the challenges of the other blacks from the panel.

MJ: Well, of course, there were—I think at least two black members that were excused by challenges for cause, but neither one of those had any racial foundation; is that correct?

DC: Yes, sir.

After further discussion concerning specific rationale for these challenges, trial counsel stated his reason for challenging Staff Sergeant Edwards.

TC: My articulation, sir, is, first of all, in my opinion Staff Sergeant Edwards' responses to the voir dire, while satisfactory, didn't indicate to me to be the kind of member that the government would want on this case and one thing particularly that he said, if I remember correctly, he said that he would consider this as a learning experience which, in the Government's opinion, that was not the—while not challengeable for cause, that is why the government chose to exercise its peremptory challenge on him.

Appellant contends that this is not the neutral basis for challenge required by *Batson.* The Government asserts that trial counsel's explanation indicated that the purpose for the challenge was race-neutral assuming *arguendo* that a prima facie case of discrimination had been shown.

In deciding this issue we will initially analyze whether there was a prima facie showing of purposeful discrimination in connection with the peremptory challenge of Staff Sergeant Edwards. First, appellant is a member of a cognizable racial group and, second, the Government's peremptory challenge sought to remove a member of that group. The only remaining question is whether the totality of the circumstances raise an inference that the challenge was used to exclude this member solely because of race.

Examining the pattern of challenges exercised by trial counsel, we note that chal-

lenges for cause were exercised against one white and one black officer. The black officer was challenged because of his beliefs regarding capital punishment. In fact, defense counsel agreed with the military judge that this challenge had no racial foundation. Appellate defense counsel further concedes that he can point to nothing which proves the challenge was racially motivated. Our review of the record likewise reveals nothing said by trial counsel during *voir dire* that would infer the challenge was racially motivated. Our determination of this question is hampered by the fact that the military judge made no findings with respect to this prima facie showing either because he simply neglected this step in applying the *Batson* principles or because he believed there was an automatic inference of purposeful exclusion merely because of the defense theory involving racial prejudice or for some other reason. Without speculating further, we will exercise caution and follow the Court of Military Appeals in their belief that the trial judge is able to decide if all of the circumstances surrounding the challenge create a prima facie case. *Santiago–Davila,* 26 M.J. at 392.

Finally, we must analyze whether trial counsel's explanation was neutral. Trial counsel stated that Staff Sergeant Edwards was not the kind of member the Government wanted on the case because he stated he would use it as a learning experience.[11] In response to this explanation the military judge indicated that this was the only thing he had written down with respect to Staff Sergeant Edwards. He noted that it was probably an unfortunate choice of words but it nevertheless caught his attention. The military judge, in denying the defense's objection and thus sustaining the peremptory challenge, found

that, while he might not agree with the Government's stated reason, it was understandable and had sufficient foundation to satisfy *Batson.* We agree with the military judge.

Trial counsel's questioning during the entire *voir dire* reflected the fact that he wanted the court to consist of members who were aware of the serious responsibility of deciding a capital case and who were capable of carrying out that responsibility. We believe that trial counsel sensed something less than these qualities in Staff Sergeant Edwards and felt that a case with the serious consequences of this one should not be used as a "learning experience". We find this explanation to be totally devoid of any racial motivation and to be completely neutral.

## VIII

### Appropriateness of the Sentence to Death

Finally, we consider the appropriateness of appellant's sentence to death. Appellant contends that he should not be put to death because his murder of the Lotzs was simply a reaction to the way he had been treated by Lieutenant Lotz. He also contends that no proper penal interest would be served by such a sentence. He argues that these factors militate against imposition of the death penalty in this case. Chief Judge Byrne in his dissent, cites the "racial stereotyping of appellant by Lieutenant Lotz",[12] as well as the lack of recent precedent for executions in the Naval Service, as reasons for opposing the death penalty in this case. We do not agree with this reasoning.

We begin our analysis of this issue by carefully considering Lieutenant Lotz's re-

---

11. There may have been other factors of concern to trial counsel such as the difficulty he encountered in explaining to Staff Sergeant Edwards the concept of the Government's burden to prove guilt beyond a reasonable doubt. We will not speculate, however, as to what "other" factors may have influenced trial counsel to exercise this challenge and we have confined our analysis solely to the reason stated in the record.

12. In support of this reason, Chief Judge Byrne states that racial prejudice in sentencing was an underlying rationale for striking down the death penalty in *Furman.* Such rationale is inapposite to this case since in *Furman* the racial prejudice under consideration was that of the jury against the defendant rather than any prejudice by the victim against the accused as alleged in this case.

lationship with his subordinates and the atmosphere that existed in the supply office. Lieutenant Lotz referred to his subordinates by nicknames, either nicknames he coined himself or those invented by others. A Marine of Peruvian descent was called "a fuzzy headed foreigner"; others had names such as "tomahawk", "red", and "Jonesy". Lotz's use of nicknames was not confined to persons in his office and he called a black Marine officer friend, "Action Jackson". Several nicknames were used with respect to appellant—"Bebop Curtis" and "Curtis Blow" (apparently in reference to a black "rap" singer). In addition to the use of nicknames, Lotz allowed music to be played in the work spaces, and this was often "rap" music. While listening to this music, Lotz, on occasion, imitated what he thought were black mannerisms. The atmosphere was described by some as joking and casual.

Following a supply inspection, Lotz was criticized by the inspector for calling his subordinates nicknames and was told that this practice was unprofessional. Thereafter, Lotz called the office personnel together and inquired as to whether the use of nicknames was offensive to anyone. No one present, including Curtis, voiced an objection to this practice and the use of nicknames continued.

Appellant testified that he was nevertheless bothered by these nicknames and by Lotz snapping his fingers at him, calling his mother by her first name and criticizing him for a bad attitude. Appellant acknowledged on cross-examination that his proficiency and conduct marks had improved under Lotz and that Lotz was training him for a job of increased responsibility within the office. Co-workers characterized the occasional criticism of Curtis as justified because Curtis was a slow worker and was sometimes lazy. Appellant asserts that Lotz's actions, as a whole, were offensive to him and that he perceived Lotz to be racially prejudiced.[13]

It is apparent that Lieutenant Lotz was insensitive to the feelings of minorities and to the potential effect of his conduct in this regard. Additionally, it is apparent that Lieutenant Lotz made the mistake which some junior, relatively inexperienced officers make of creating an overly familiar, informal atmosphere with his subordinates in an attempt to be accepted. This is not a proper or professional relationship between officers and enlisted personnel. The question, however, is whether Curtis should now be exempt from the death penalty because of the flawed leadership style of Lieutenant Lotz?

This question can be phrased in another manner: whether one who is dissatisfied with what he perceives to be the improper actions of his superior should escape the most severe punishment for murdering that superior? We believe that it is contrary to the interests of society to mandate a lesser punishment for such a crime and still expect that such crimes will be deterred in the future. This is particularly true in a military environment where the very cornerstone of our system of discipline is the superior-subordinate relationship. To allow, or even suggest, that one should be less severely punished because of a "perception of maltreatment" by a superior would tear at the very fiber of our military system of discipline. We reject

13. We are unable to determine whether or not Lieutenant Lotz was, in fact, racially prejudiced. We note, however, that substantial evidence was admitted that Lotz was neither racially prejudiced nor acted in a discriminatory manner. For example, two black sergeants and a black staff sergeant who worked in the supply office testified that they did not believe that Lotz was racially prejudiced. They did not perceive "racial tension" in the office nor did they believe that the use of nicknames and imitations by Lotz were done in a racially derogatory fashion. The Company First Sergeant, also a black Marine, testified that during his twenty-five years of active duty he had seen racial prejudice; however, after knowing Lieutenant Lotz for two years, it was his opinion that Lotz was not prejudiced against black Marines. First Lieutenant Jackson, a black officer, knew Lotz well for almost eight months and testified that there was no question in his mind that Lotz was not prejudiced. Finally, a young black civilian testified that he lived with Lieutenant and Mrs. Lotz for about three months while he assisted Mrs. Lotz in coaching a basketball team at the school where she taught. He was treated as a member of the family in almost a "parental relationship".

the notion that the death penalty is inappropriate under the circumstances of this case based on Curtis' perception of his relationship with Lieutenant Lotz.

Even if we were to believe that appellant's perception of mistreatment by Lotz somehow militated against the death penalty for killing Lieutenant Lotz, it is inexplicable why this in any way lessens his culpability for the brutal slaying of Mrs. Lotz. Curtis savagely stabbed Joan Lotz seven times as she begged for him to stop and then indecently assaulted her as she lay dying. Curtis admitted that Joan Lotz never did anything to hurt him.

■ We next address the argument that the death sentence is inappropriate simply because it has not been imposed in the Naval Service in recent history. This fact alone is not dispositive of the issue. As previously discussed in Section III, Congressional intent that death be a sentencing option for premeditated murder remains viable today. In addition, while no death sentences have been carried out in the recent past, the military community has recently expressed its intent that death is the appropriate sentence for premeditated murder under certain circumstances by adjudging death at the courts-martial level. *See United States v. Turner*, No. 85–4044 (NMCMR 8 August 1986), *rev'd*, 25 M.J. 324 (C.M.A.1987), *aff'd*, No. 85–4044R (NMCMR 31 October 1988) (convening authority commuted death sentence to life imprisonment); *United States v. Rojas*, 15 M.J. 902 (NMCMR 1983), *rev'd in part*, 17 M.J. 154 (NMCMR 1981) (death sentence reversed for constitutional procedural infirmity, not for inappropriateness); *United States v. Hutchinson*, 15 M.J. 1056 (NMCMR 1983), *rev'd in part*, 18 M.J. 281 (C.M.A.1984) (summary disposition) (death sentence reversed for constitutional procedural infirmity, not for inappropriateness). We find these expressions of intent to be persuasive and discount any bar to approving the death sentence based on when the last time such a sentence was carried out.

■ Lastly, we address the contention that death serves no penal interest. The death penalty serves two social purposes: deterrence and retribution. *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–2930, 49 L.Ed.2d 859, 880. Appellant argues that deterrence can be accomplished with a life sentence and that retribution is irrational and has no place in the military justice system. We reject this argument.

As we previously noted, deterring serious criminal misconduct is of particular importance in the military because our ability to fulfill our mission is directly related to the discipline of our forces. In order for deterrence to be effective, we believe the full range of punishments for a particular offense ought to be available and that the punishment should be tailored to the individual and the circumstances of the offense.

Contrary to appellant's assertion, retribution has a place in our system of justice. In *Gregg*, Justice Stewart, in discussing retribution noted:

> [C]apital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

*Id.* 428 U.S. at 183, 96 S.Ct. at 2930, 49 L.Ed.2d at 880.

Justice Stewart further noted in *Gregg* a speech on capital punishment given by Lord Justice Denning, Master of the Rolls of the Court of Appeal in England, in which it was stated:

> The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrongdoer deserves it, irrespective of whether it is a deterrent or not.

Royal Commission on Capital Punishment, minutes of Evidence, Dec. 1, 1949, p. 207 (1950).

■ In this case, we view the crimes committed by Curtis to be heinous and outrageous. The slaying of Lieutenant Lotz, Curtis' officer-in-charge, and Mrs. Lotz in their quarters aboard a military base and the manner in which these killings were accomplished convinces us that the

death sentence is clearly proper. We do not arrive at this conclusion lightly and have carefully considered all of the circumstances surrounding the offenses and all evidence of extenuation and mitigation. Taking all of these factors into consideration, we find the sentence to death to be appropriate in this case.

## IX

### Decision

We have carefully examined the record of trial, the clemency request, the assignments of error and the Government's reply thereto and have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. We are convinced of appellant's guilt of all of the charges and specifications beyond a reasonable doubt and specifically find the sentence to be appropriate. Article 66(c), Uniform Code of Military Justice.

Accordingly, the findings and sentence, as approved on review below, are affirmed.

1. Solis, LCOL Gary D., *Marines and Military Law In Vietnam: Trial by Fire* (Working Draft) History and Museums Division, Headquarters, U.S. Marine Corps.

2. *See, e.g., Furman v. Georgia,* 408 U.S. 238, 251–53, 363–367, 92 S.Ct. 2726, 2732–33, 2763, 2789–91, 33 L.Ed.2d 346, 355–57, 390, 420–22.

3. In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Justice Stewart stated:

 While Furman did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, Furman held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. Mr. Justice White concluded that "the death penalty is exacted with great infrequency even for the most atrocious crimes and ... there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." 408 US, at 313, 33 LEd2d 346, 92 S Ct 2726 (concurring). Indeed the death sentences examined by the Court in Furman

Senior Judges COUGHLIN and RILEY, and Judges McLERAN, MIELCZARSKI, JONES and RUBENS concur.

BYRNE, Chief Judge (concurring/dissenting):

I believe life imprisonment, not death, is the appropriate penalty in this case.

The racial stereotyping, by one of the two murder victims, precipitated appellant's violent acts. *See, e.g.,* R. 591, 602–605.

This fact is vital because a matrix of contexts circumscribes when the death penalty is appropriate in the Naval Service. A Marine has not been executed since 1817.[1] There are strong religious and moral factors weighing against imposition of this ultimate sanction. Concern with racial prejudice in sentencing underlies the Supreme Court's rationale in *Furman v. Georgia.*[2] The Supreme Court has fenced in the death penalty with unique constraints limiting its imposition—in contrast to other lawful, imposable punishments.[3]

were "cruel and unusual in the same way that being struck by lightning is cruel and unusual. For all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in Furman were] among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.... [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." Id. [408 U.S.] at 309–310, 33 LEd2d 346, 92 SCt 2726. (Stewart, J., concurring). 428 U.S. at 188, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

 Later, Justice Stewart concluded:
 In summary, the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information. 428 U.S. at 195, 96 S.Ct. at 2935, 49 L.Ed.2d at 887.

Consequently, before any system of criminal justice in this land executes the death penalty, its rationale for doing so must be capable of withstanding withering scrutiny.[4] The crimes committed by the accused must "cry out" for death. The racial overtones in this case have silenced that cry, in my opinion.

I would affirm only so much of the sentence as provides for confinement for life, total forfeitures, a dishonorable discharge, and reduction to pay grade E–1.

In all other respects, I concur with Judge Strickland's opinion.

ALBERTSON, Judge (concurring in part/dissenting in part):

I concur with the majority on their resolution of all issues except those discussed in section's three and eight of the majority opinion. I dissent from their resolution of the assignment of error relating to the Presidential authority to promulgate Rule for Court–Martial (R.C.M.) 1004, Manual for Courts–Martial (MCM), 1984, because I have concluded that, until Congress acts in an affirmative manner, the Article 118, Uniform Code of Military Justice (UCMJ), provision authorizing the imposition of the death penalty is constitutionally invalid as a result of the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Even if I am incorrect in that conclusion, I further conclude that the delegation of authority by the Congress to the President to promulgate R.C.M. 1004(c) was absolutely impermissible and as presently set forth in Article 36, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 836, does not include

sufficient standards to guide the President, in accordance with the principles set forth in *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), to promulgate R.C.M. 1004(c).

R.C.M. 1004 enunciates the only procedures and aggravating factors within the military justice system (except for Article 106a, UCMJ) for determining the appropriateness of the imposition of the death penalty. R.C.M. 1004 was promulgated in light of the suggestion of the United States Court of Military Appeals decision in *United States v. Matthews*, 16 M.J. 354 (C.M.A. 1983) which in turn was based upon the United States Supreme Court decision in *Furman v. Georgia*. Thus, I do not contest the finding of my Brothers in the majority that the procedures set forth in R.C.M. 1004(a), (b), (d) and (e) meet the requirements the Supreme Court mandated before imposition of the death penalty could be considered constitutional. I believe, however, that the only Governmental authority that can identify, at least as they relate to aggravating factors, (*i.e.*, R.C.M. 1004(c)) and effectuate the standards for imposition of the death penalty in accordance with the Supreme Court's mandate within the military justice system, as it is presently established, is the United States Congress. While Congress might be able to delegate the *Furman* mandate, it can only do so after meeting certain criteria, *United States v. Mistretta*, — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) citing *American Power and Light Co. v. SEC*, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946),[1] which, at this point in time, it has not met. Accordingly, I find that the impo-

---

**4.** Professor of Law George E. Dix commented in a Georgetown Law Journal article regarding appellate review of death sentences:

Such a review implicitly includes an evaluation of whether reasonable persons would regard the death sentence as disproportionate to the offender's culpability, given the nature of the crime committed, the circumstances of its commission, and possible influences upon the defendant.

PIX, George E., "Appellate Review of the Decision To Impose Death," 68 Geo.L.J. 93, 107.

**1.** As quoted in the recent Supreme Court decision of *Mistretta v. United States*, — U.S. —,

—, 109 S.Ct. 647, 652–54, 102 L.Ed.2d 714 (1989): "'The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its functions.' *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421, 55 S.Ct. 241, 248, 79 L.Ed. 446 (1935). Accordingly, this Court has deemed it 'constitutionally sufficient' if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *American Power and Light Co. v. SEC*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946).

sition of the death penalty upon a military accused convicted within the military justice system is unconstitutional under the principles announced in *Furman v. Georgia,* (hereinafter *Furman*) and *United States v. Mistretta.* I shall explain in more detail below. With regard to the eighth assignment of error, the appropriateness of the imposition of the death penalty in appellant's case, I dissent only because I cannot reach a consideration of that issue since I am not convinced that the death penalty is a valid punishment or that the guidelines set forth in R.C.M. 1004(c) are authorized and appropriate guidelines.

## I.

### *Furman v. Georgia*

*Furman* declared that existing state capital punishment statutes violated the Eighth Amendment because they permitted exercise of uncontrolled discretion by sentencing authorities in determining whether to impose capital punishment in any specific case. *United States v. Matthews,* 16 M.J. at 369. Subsequently in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. at 2920, 49 L.Ed.2d at 859 (1976) (hereinafter *Gregg*), the Supreme Court examined the new (post-*Furman*) Georgia statute which retained the death penalty for six categories of crime. In addition to the six categories of crime for which the legislature retained the death penalty, the Georgia legislature also adopted new trial procedures and capital sentencing guidelines that it mandated be followed before imposition of the death penalty upon one convicted of a capital offense was authorized. For example, the Georgia statute established a bifurcated trial, including a separate sentencing stage wherein evidence in aggravation, extenuation, and mitigation of the crime was presented. Additionally, the judge was required to instruct the jury as to any of 10 statutory aggravating circumstances that were supported by the evidence and that it,

the jury, must find, and specify, at least one of the ten aggravating circumstances beyond a reasonable doubt before they could adjudge the death penalty. Finally, the new statute required expedited and automatic direct review by the state supreme court.

The Supreme Court upheld the new Georgia statute as passing constitutional muster because the jury's attention had been focused "on the particularized nature of the crime and the particularized characteristics of the individual defendant." *Gregg,* 428 U.S. at 206, 96 S.Ct. at 2940, 49 L.Ed.2d at 893. In particular the Court was impressed with the channeling of the jury's discretion such that the jury could not impose the death sentence in a wanton and freakish manner. The Supreme Court arrived at the same conclusion with regard to Florida's reenacted statute. *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, *reh'g den.* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976).

## II.

### Impact Of *Furman* On Article 118, UCMJ

What, then, is the status of Article 118, UCMJ? In 1950 Congress enacted Article 118, Uniform Code of Military Justice, 10 U.S.C. § 118. That article defines the offense of murder within the military community. Within that statute Congress identified four specific types of murder of which two, premeditated murder [Article 118(1)] and murder committed during the commission of certain felonies [Article 118(4)], were designated capital offenses. The other two types of murder, death as a result of an act done with the intent to kill or inflict great bodily harm [Article 118(2)] and death resulting from an act inherently dangerous to others [Article 118(3)], were designated as offenses punishable "as a court-martial may direct."[2] *See* R.C.M.

---

**2.** The legislative history to Article 56, UCMJ, wherein the Congress gave the President broad authority to set the maximum punishment for offenses which a court-martial may direct and which a court-martial could not thereafter exceed when directing punishment, clearly reveals

that Congress never intended the President to deal in any way with the death penalty. In fact, the hearings relating to Article 56, in particular, reveal concern that the wording of the provisions be carefully articulated so that assurance could be had that the President could never

1003(b). Offenses punishable "as a court-martial may direct" have generally been understood to carry any punishment exclusive of death, *see, e.g.,* para. 127(c), (Article 118) MCM, 1969; para. 43(e), Part IV, MCM, 1984, and exclusive of those punishments deemed cruel and unusual under Article 55, UCMJ. Article 118 has not been amended since the enactment of the UCMJ. Thus, Article 118 is a pre-*Furman* statute.[3]

The next step is to determine what impact the Supreme Court's decisions in *Furman* and *Gregg* have on pre-*Furman* statutes, such as Article 118, in which the death penalty is authorized but fails to set forth *Furman–Gregg* type guidelines.[4] In other words, what is the status of Article 118 in view of *Furman?*

I believe the concurring and dissenting opinions in *Furman* clarify its impact on Article 118's status.[5] First, let us look at the concurring opinions that provide the narrowest grounds for the majority's opinion. Justice Stewart concurred in reversing Furman's sentence to death because he believed that "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."

*Furman,* 408 U.S. at 310, 92 S.Ct. at 2763, 33 L.Ed.2d at 390. Justice White, also concurring, stated:

> ... [A]s the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice.

. . . . .

> In this respect, I add only that past and present legislative judgment with respect to the death penalty loses much of its force when viewed in light of the recurring practice of delegating sentencing authority to the jury and the fact that a jury, in its own discretion and without violating its trust or any statutory policy, may refuse to impose the death penalty no matter what the circumstances of the crime. Legislative "policy" is thus necessarily defined not by what is legislatively authorized but by what juries and judges do in exercising the discretion so regularly conferred upon them. In my judgment what was done in these cases violated the Eighth Amendment.

408 U.S. at 313–314, 92 S.Ct. at 2764, 33 L.Ed.2d at 392–393.

make an offense a capital offense that the Congress itself had not declared capital. Index and Legislative History of the Uniform Code of Military Justice, HH at 1187.

**3.** By analogy then, Article 118—and any other death penalty offenses within the UCMJ, with the exception of Article 106a—should be in the same status as those state statutes which *Furman v. Georgia* declared unconstitutional. Since *Furman,* at least 35 of those states having *Furman*-invalidated statutes, have, through the positive action of their legislatures, taken action to reinstate the death penalty for some offenses and provide the guidelines required by *Furman. E.g., Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, *reh'g den.* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976).

**4.** We do recognize, as the Court of Military Appeals did in *Matthews,* that many of the procedures within the military justice system, such as a bifurcated trial and the opportunity to present aggravating, extenuating and mitigating evidence on sentencing, probably meet some of

the Supreme Court's concerns. The court-martial process did not, however, address the concept of finding and weighing aggravating and mitigating factors by some identified standard such that unfettered, and possibly discriminatory, discretion was not controlled.

**5.** We must look at the various concurring and dissenting opinions to attempt to elicit the intended impact of *Furman* because no unified majority opinion explaining the result was arrived at by the Court. Accordingly, what other way can we determine the exact intent of the Court other than to glean from the concurring and dissenting opinions what the Court as individuals believed was the impact of the decision. *See Gregg v. Georgia,* 428 U.S. at 169, n. 15, 96 S.Ct. at 2909 n. 15, 49 L.Ed.2d at 859, n. 15 (1976); *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); Annotation, "Supreme Court's Views on Constitutionality of Death Penalty and Procedures Under Which It Is Imposed." 51 L.Ed. 886; Annotation, "Binding Effect Upon State Courts of Opinion of United States Supreme Court Supported by Less Than Majority of All Its Members." 65 ALR3d 504.

Now let us turn to the dissenters. Chief Justice Burger stated in his dissent:

The actual scope of the Court's ruling, which I take to be embodied in these concurring opinions, is not entirely clear. This much, however, seems clear: if the legislatures are to continue to authorize capital punishment for some crimes, juries and judges can no longer be permitted to make the sentencing determination in the same manner they have in the past.

408 U.S. at 397, 92 S.Ct. at 2807, 33 L.Ed.2d at 440.

The Chief Justice went on to say:

While I would not undertake to make a definitive statement as to the parameters of the Court's ruling, it is clear that if state legislatures and the Congress wish to maintain the availability of capital punishment, significant *statutory* changes will have to be made.... (Emphasis added.) [L]egislative bodies may seek to bring their laws into compliance with the Court's ruling by providing standards for juries and judges to follow in determining the sentence in capital cases or by more narrowly defining the crimes for which the penalty is to be imposed.

408 U.S. at 400, 92 S.Ct. at 2809, 33 L.Ed.2d at 442. Finally, the Chief Justice stated:

Since there is no majority of the Court on the ultimate issue presented in these cases, the future of capital punishment in this country has been left in an uncertain limbo. Rather than providing a final and unambiguous answer on the basic constitutional question, *the collective impact of the majority's ruling is to demand an undetermined measure of change from the various state legislatures and the Congress.* (Emphasis added.) While I cannot endorse the process of decision making that has yielded today's result and the restraints that result imposes on legislative action, I am not altogether displeased that legislative bodies have been given the opportunity, and indeed unavoidable responsibility, to make a thorough re-evaluation of the entire subject of capital punishment. If today's opinions demonstrate nothing else, they starkly show that this is an area where legislatures can act far more effectively than courts.

408 U.S. at 403, 92 S.Ct. at 2811, 33 L.Ed.2d at 444. Also dissenting was Justice Powell who wrote:

Because of the pervasiveness of the constitutional ruling sought by petitioners, and accepted in varying degrees by five members of the Court, *today's departure from established precedent invalidates a staggering number of state and federal laws.* (Emphasis added.) The capital punishment laws of no less than 39 States (footnote omitted) and the District of Columbia are nullified. In addition, *numerous provisions of the Criminal Code of the United States and of the Uniform Code of Military Justice also are voided.* (Emphasis added.) The Court's judgment not only wipes out laws presently in existence, but denies to Congress and to the legislatures of the 50 States the power to adopt new policies contrary to the policy selected by the Court....

[T]he impact of the majority's ruling is all the greater because the decision encroaches upon an area squarely within the historic prerogative of the legislative branch—both state and federal—to protect the citizenry through the designation of penalties for prohibitable conduct. It is the very sort of judgment that the legislative branch is competent to make and for which the judiciary is ill-equipped.

408 U.S. at 462–463, 92 S.Ct. at 2840, 33 L.Ed.2d at 418.

Justice Blackmun, dissenting, found:

Not only are the capital punishment laws of 39 States and the District of Columbia struck down, but also all those provisions of the federal statutory structure that permit the death penalty apparently are voided. No longer is capital punishment possible for [various federal crimes listed in Title 18 U.S.Code]. Also in jeopardy, perhaps, are the death penalty provisions in various Articles of the Uniform Code of Military Justice. 10

USC §§ 885, 890, 894, 899, 901, 904, 906, 913, *918,* and 920. (Emphasis added.) All these seem now to be discarded without a passing reference to the reasons, or the circumstances, that prompted their enactment, some very recent, and their retention in the face of efforts to repeal them.

408 U.S. at 412, 92 S.Ct. at 2815, 33 L.Ed.2d at 449.

From these dissents, it would appear that at least four justices of the Supreme Court believed that *Furman* declared all state and federal statutes, including the UCMJ, null and void if they authorized the imposition of the death penalty but did not meet the standards identified by *Furman.*[6] The Ninth Circuit Court of Appeals was compelled to reach the same conclusion in *United States v. Harper,* 729 F.2d 1216 (9th Cir.1984). In fact, it based its conclusion on the position not only of petitioner, but also of the Government, whose brief on this issue in the district court stated that Title 18 U.S.C. § 794's death penalty provision is:

> ... unenforceable and void because it sets forth no *legislated* guidelines to control the fact-finder's discretion. (Emphasis added.) The Department of Justice has long been of the view that *Furman* rendered section 794's death penalty provision unconstitutional. *See Imposition of Capital Punishment:* Hearings on S. 1, S. 1400, and S. 1401 Before the Subcomm. on Criminal Laws and Procedures of the Comm. of the Judiciary, 93d Cong., 1st Sess. 43 (1973) (statement of Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, Department of Justice); To Establish Constitutional

Procedures for the Imposition of Capital Punishment: Hearings on S. 1382 Before the Subcomm. on Criminal Laws and Procedures of the Comm. on the Judiciary, 95th Cong., 1st Sess. 22 (1977) (statement of Mary Lawton, Deputy Assistant Attorney General, Office of Legal Counsel, Department of Justice); Capital Punishment: Hearings on S. 114 Before the Comm. of the Judiciary, 97th Cong., 1st Sess. 22 (1981) (statement of D. Lowell Jensen, Assistant Attorney General, Criminal Division, Department of Justice). Moreover, the Senate has recently passed a bill, supported by the Justice Department, that would authorize the imposition of the death penalty for certain crimes, including espionage. S. 1765, 98th Cong., 2d Sess., 130 Cong.Rec.S. 1491–93.

> In light of the above, we believe it clear that the death penalty provision of the espionage statutes is unconstitutional. It cannot be saved by judicial formulation of the missing, but essential, statutory guidelines.

729 F.2d at 1225–6. *See McKenzie v. Risley,* 801 F.2d 1519 (9th Cir.1986), *cert. denied* —— U.S. ——, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988).

Additionally, the decisions of the federal circuit courts, *e.g., United States v. Watson,* 496 F.2d 1125, 1129 (4th Cir.1973) and *United States v. McNally,* 485 F.2d 398 (8th Cir.1973) (*en banc*), reflect the two differing rationales state and federal courts have utilized for analyzing the continuing constitutional validity of statutes related to the imposition of the death penalty in light of *Furman.*[7] *Watson* sides with the classification rationale while *McNally* reflects the penalty rationale.[8]

---

**6.** Even though three of the justices who participated in *Furman* are no longer members of the Court, six of the *Furman* Court do remain and might continue to represent a majority should the constitutionality of Article 118's death penalty be presented. In playing the numbers game then, we know that of those six remaining justices, two justices would declare the death penalty unconstitutional per se; one justice would not declare the death penalty unconstitutional per se but would declare discretionary statutes unconstitutional; and four justices believe the *Furman* decision declares the death penalty statutes in existence at the time of the opinion null and void.

**7.** Annotation, "Effect of the Abolition of Capital Punishment on Procedural Rules Governing Crimes Punishable by Death—Post–*Furman* Decisions." 71 A.L.R.3d 454, 457–460.

**8.** The *Watson* court was concerned with the impact of *Furman* on a federal statute that gave the defendant a procedural right to two attorneys if he faced the possibility of the imposition of the death penalty. Since it was unable to

These judicial decisions shed some light on how we might interpret the status of Article 118 as a whole, or the status of its provision authorizing imposition of the death penalty in particular. The courts that follow the classification rationale hold that the statutes identifying offenses as "capital offenses" established a category of offenses that because of their gravity remained classified as "capital offenses." That being so, all statutes that interrelated to a "capital offense" statute remained operative if a capital offense was involved. The courts using the penalty rationale declare that since capital punishment provisions were no longer constitutional unless they met current schemes offered by the judiciary, the "capital offense" no longer existed. Thus, any legislation that was triggered by the possibility of imposition of the death penalty was not operative until that penalty was again constitutionally imposable. Hence, while the death penalty may be authorized by the legislature, its imposition is constitutionally prohibited; the authorization provision is invalid.

I can accept the penalty rationale more readily than I can the classification rationale because of the concept of severability. It is well-established that a statute may be constitutional in part and unconstitutional in another; and, as long as the unconstitutional provision is severable from the rest of the statute, the constitutional provision will stand with its unconstitutional aspect rejected. *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). But regardless of which rationale one accepts, I believe little argument remains with the fact that *Furman*, at the very least, declared all provisions of statutes authorizing imposition [9] of capital punishment existing at the time of the decision ineffectual. *Gregg v. Georgia*, 428 U.S. at 153, 96 S.Ct. at 2920; *Watson*, 496 F.2d 1125; *In re Ex Parte Bynum*, 294 Ala. 78, 312 So.2d 52 (1975).

All of this precedent tells me that the federal and state courts have exercised caution when called upon to interpret the impact of *Furman* on a statutory authori-

determine that the sole reason Congress gave the accused the procedural right in question was because of the possibility of the imposition of the death penalty, a possibility that no longer existed, it refused to hold the procedural right inapplicable to a defendant convicted under the statute which Congress had done nothing about since *Furman*. Thus, *Watson* looked at the death penalty provision as a not only a penalty provision that may or may not be capable of imposition but as a means for classifying an offense as one of the most severe types of offenses.

We have no doubt that *Furman* raises pointed legislative questions of whether section 3005 should not be repealed or whether the various provisions of Title 18 which purport to authorize the imposition of the death penalty should be amended in an effort to harmonize them or to validate them under *Furman*.... But we conceive these to be legislative questions and not judicial ones, especially when a holding by us that *Furman* has effected a repeal of section 3005, of necessity, would probably create serious doubt as to whether the various other provisions of Title 18 and the Federal Rules of Criminal Procedure, to which we have referred, have also been repealed. The question of whether these statutes and the rule should now be repealed merits the prompt consideration of Congress and the Rules Committee, but we regard our

role as one of proceeding with caution unless and until it unmistakably and clearly appears that *Furman* has had this effect. This, we fail to find.
*Watson*, 496 F.2d at 1129-1129. The Court then held that the defendant had the statutory right to have two attorneys because he was facing conviction for a crime that authorized the death penalty even though the imposition of the death penalty under federal law as it existed at that time was ineffectual.
*McNally*, on the other hand, determined that when the death penalty has been determined by a court or the prosecution not to be appropriate because of *Furman*, "the case lost its capital nature" and the defendant was not entitled to the advantage of any procedure which was otherwise required in the prosecution of a capital offense. *McNally*, 485 F.2d at 407. Thus, *McNally* looked at the death penalty provision as solely a penalty provision.

9. The key word here is "imposition". *Furman*, at the very least, declared imposition of the death penalty outside its guidelines unconstitutional. The death penalty was still authorized but its imposition, the ability to effectuate it, was possible only after the development of specific and controlled discretionary guidelines and procedures and the application of those guidelines and procedure by the authorized fact-finder.

zation for imposition of the death penalty. Where legislatures have not specifically and affirmatively indicated their intent since *Furman* to authorize imposition of the death penalty by reenacting, reinstating, modifying, or, in some other permissible way, validating the authorization provision in question, these courts have also exercised caution when they have had to determine the applicability of statutes that grant or deny a defendant a procedural right that is dependent upon him facing the possibility of the imposition of the death penalty. In light of this exercise of caution, I believe this Court should also exercise caution in interpreting legislative inaction or implicit ratification of the U.S. Congress when determining whether Article 118's authorization for the imposition of death remains valid since the decision in *Furman*. Although appellate courts act on the presumption of constitutionality of statutory provisions, because the case law since *Furman* has not made it unmistakably clear to me that Article 118's death penalty authorization provision is constitutional, I cannot find that it is constitutional. *See United States v. Watson*, 496 F.2d 1125, 1129 (4th Cir.1973). If it is not a constitutionally valid provision because Congress has not affirmatively demonstrated its reinstatement of that penalty provision, let alone given the guidelines required by *Furman–Gregg*, then the imposition of the death penalty within the military justice system is unconstitutional.

### III.

### Presidential Effectuation Of An Invalid Statutory Provision

Let us presume, however, that Article 118's provision authorizing the death penalty is not void but merely ineffectual. How can it be effectuated? In this particular case, can the President pursuant to Article 36, UCMJ, effectuate, *i.e.*, make constitutionally permissible, Article 118's authorization for imposition of the death penalty, by promulgating R.C.M. 1004?

In *United States v. Matthews*, 16 M.J. at 354, the Court of Military Appeals held that the sentencing standards then existing under the UCMJ were defective because they failed "to require that the court members make specific findings as to individualized aggravating circumstances—findings which can, in turn, be reviewed factually and legally." *Id.*, at 380. In dicta the Court then indicated how the defective sentencing standards could be corrected:

Congress can take action to remedy this defect that now exists in the sentencing procedure employed by courts-martial in capital cases. However, corrective action also can be taken by the President in the exercise of his responsibilities as commander-in-chief under Article II, Section 2, and of powers expressly delegated to him by Congress. *See* Article 36, UCMJ, 10 U.S.C. § 836.

The Court further expounded on its theory that the President could take the corrective action needed:

The congressional delegation of powers to the President has traditionally been quite broad in the field of military justice. Pursuant to Article 36 of the Uniform Code, the President promulgates rules to govern pretrial, trial, and posttrial procedures of courts-martial. Unlike other Federal criminal statutes, the punitive articles of the Uniform Code for the most part authorize punishment "as a court-martial may direct"; no maximum or minimum sentence is specified. (Footnote omitted.) However, as contemplated by Article 56, of the Uniform Code, 10 U.S.C. § 856, the President prescribes maximum punishments for the various offenses. (Citation omitted.) The great breadth of the delegation of power to the President by Congress with respect to court-martial procedures and sentences grants him the authority to remedy the present defect in the court-martial sentencing procedure for capital cases. *Cf. Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Indeed, a proposed revision [10] of the Manual for Courts-Mar-

---

**10.** The proposed revision of the Manual for Courts–Martial mentioned by the Court of Mili-

tary Appeals in *Matthews* referred to what ultimately became Rule for Courts-Martial

tial, which [is] ... R.C.M. 1004 ... prescribes special procedures for sentencing in capital cases.

*Matthews,* 16 M.J. at 380–381. (Footnote added).

The President heeded the *Matthews* dicta and promulgated R.C.M. 1004. Despite our supervisory court's dicta in *Matthews,* and its apparent anticipatory sanction of the President's action, I believe there is a separation of powers issue that the Court of Military Appeals may not have considered at the time. Additionally, I believe significant case law addressing the separation of powers issue has been decided since *Matthews, see Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *United States v. Harper,* 729 F.2d 1216 (9th Cir.1984), that impacts upon the continued validity of the dicta such that it may reexamine *Matthews. See United States v. Carter,* 25 M.J. 471, 473 (C.M.A.1988).

Elementary civics teaches us that:

... the executive department, like the judicial, must yield in most matters to the creative power of the legislature (footnote omitted); the legislature makes laws and the executive enforces them when made, and each department is, in the main, supreme within its own field of action (footnote omitted). The executive cannot discharge the functions of the legislature in any manner by so acting in his official capacity that his conduct is tantamount to a repeal ( ... *Henry v. State,* 10 Okla.Crim. 369, 136 P. 982), enactment (*Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 ...;), variance, or enlargement (*Whitcomb Hotel, Inc. v. California Employment Com.,* 24 Cal.2d 753, 151 P.2d 233, 155 A.L.R. 405; *Boone v. Kingsbury,* 206 Cal. 148, 273 P. 797, *cert. den.* and *app dismd* 280 U.S. 517, 50 S.Ct. 66, 74 L.Ed. 587, and *cert. den.* and *app dismd* 280 U.S. 517, 50 S.Ct. 66, 74 L.Ed. 588). Thus, the President of the United States has no authority, even under the clause requiring him to see that the laws are faithfully executed, to suspend of his own motion the operation of acts of Congress (*Kendal v. United States,* 37 U.S. 524, 9 L.Ed. 1181).

16 Am.Jur.2d sec. 305 at 821–822.

Just as the President cannot legislate, neither can the courts by judicial construction. *See United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). As the majority notes in its equal protection discussion: "In *Gregg* the Supreme Court reasoned that because of the complex issues involved in determining the moral values of society and the social utility of the death penalty, it is particularly within the province of the legislature to establish the degree of punishment for certain classes of crime." This, for me includes, factors that differentiate capital murder from non-capital murder.

Whether an unconstitutional provision of a death penalty statute can be subsequently effectuated with corrective action has been answered affirmatively by *Gregg v. Georgia,* 428 U.S. at 206, 96 S.Ct. at 2940, and *Profitt v. Florida,* 428 U.S. at 242, 96 S.Ct. at 2960, when the Supreme Court approved new statutes enacted by the state legislatures subsequent to *Furman.* The new legislation reaffirmed the legislative policy of the appropriateness of the imposition of the death penalty as to certain categories of crime and channeled the decision-making for imposition of the death penalty by establishing certain specified aggravating factors and several procedural safeguards. Positive action to establish or reaffirm policy and to establish standards for channelling decision-making in an attempt to make law as to crime and punishment in compliance with the Constitution is beyond question the sole province of the legislature. *United States v. Wiltberger,* 18 U.S. 76, 5 Wheat. 76 (1820). As with many of Chief Justice Marshall's opinions, the principle he enunciated about the power to legislate being within the sole province of the legislature has remained good law through the years. *Whalen v. United*

(R.C.M.) 1004, Manual for Courts–Martial (MCM), 1984.

1104

*States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1954); *United States v. Evans,* 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948); *Howell v. Mississippi,* 300 So.2d 774 (1974).

My Brothers give four reasons for their belief that the President can validate the ineffectual provisions of Article 118. First, they rely on the Congressional enactment, unchanged since 1951, of Article 36, UCMJ, which they believe delegates to the President that authority:

> (a) Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, ... may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.
>
> (b) All rules and regulations made under this article shall be uniform insofar as practicable and shall be reported to Congress.[11]

Second, they rely on what they consider the expression of congressional intent with regard to the President's authority to set punishments, including the death penalty,

as explicitly set forth in Article 56, UCMJ: "The punishment which a court-martial may direct for an offense may not exceed such limits as the President may prescribe for that offense."[12] The third reason is what they believe is recognition of the authority of the President to do so by the Court of Military Appeals in their decision in *Matthews,* 16 M.J. at 354; the President's implementation of that advice; and the Congressional ratification, albeit *sub silentio,* of the provision in question.[13] Finally, the majority believes that the President has been properly delegated broad authority to effectuate Article 118's death penalty provision because the President's authority as Commander-in-Chief of the Armed Forces is based upon a long-standing special relationship with the Congress, an historical relationship so unique from any other, that he alone has the expertise to determine what is necessary to maintain morale and discipline within the military. This special relationship, they conclude, enables the President to meet the *Furman* mandate better than any other mechanism.

I do not accept those reasons because of two long standing principles: (1) Congress cannot delegate its legislative power to the President (the nondelegation principle); *Marshall Field and Co. v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892);[14] and (2) penal rules must be strictly construed.[15]

**11.** Some of my Brother judges believe that the President has merely "applied the principles ... recognized in the trial of criminal cases in the United States district courts, ..." and that those principles are the guidelines established by the Supreme Court in *Furman* and *Gregg.* My counter-argument is that the courts, including the United States Supreme Court, have recognized that they cannot legislate. *United States v. Harper,* 729 F.2d 1216 (9th Cir.1984); *see, e.g., Furman,* 408 U.S. at 398, 92 S.Ct. at 2808 (Burger, C.J., dissenting).

**12.** The Table of Maximum Punishments, paragraph 127(c), Manual for Courts–Martial, 1951, and 1969, show the President referring to Article 118 for a definition of the maximum punishment permitted for murder rather than him stating it in his own terms as the maximum sentence permissible.

**13.** Provisions of the Manual for Courts–Martial made pursuant to Article 36, UCMJ, must be reported to Congress. Article 36(b), UCMJ.

**14.** Two important facts to remember in this regard are the constitutional provisions speaking about the legislative and executive branch responsibilities toward the armed forces. Article I, section 8, clause 14 states that "The Congress shall have the Power ... To make Rules for the Government and Regulation of the land and naval Forces." Article II, section 2 states: "The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States...."

**15.** "The rule that penal laws are to be construed strictly is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger,* 18 U.S. 76, 5 Wheat. (U.S.) 76, 95, 5 L.Ed. 37, 42

In *United States v. United Verde Copper Co.*, 196 U.S. 207, 25 S.Ct. 222, 49 L.Ed. 449 (1905), the Supreme Court applied the nondelegation principle to the executive branch. In *United Verde* the Secretary of the Interior had established regulations under the supposed authority of Congress to implement an act of Congress. In doing so, he tried to give "an authoritative and final construction of the statute" and in doing that the Court said:

> If rule 7 is valid, the Secretary of the Interior has power to abridge or enlarge the statute at will. If he can define one term, he can another. If he can abridge, he can enlarge. Such power is not regulation: it is legislation. The power of legislation was certainly not intended to be conferred upon the Secretary.

196 U.S. at 212, 25 S.Ct. at 225.[16]

In *Reid v. Covert*, 354 U.S. 1, 38–39, 77 S.Ct. 1222, 1241–42, 1 L.Ed.2d 1148, 1172 (1957), the President's authority to act in his capacity as Commander-in-Chief with regard to the administration of military justice specifically was addressed:

> It must be emphasized that every person who comes within the jurisdiction of courts-martial is subject to military law—law that is substantially different from the law which governs civilian society. Military law is, in many respects, harsh law which is frequently cast in very sweeping and vague terms. It emphasizes the iron hand of discipline more than it does the even scales of justice. Moreover, it has not yet been definitely established to what extent the President, as Commander-in-Chief of the armed forces, or his delegates, can promulgate, supplement or change substantive military law as well as the procedures of military courts in time of peace, or in time of war.... If the President can provide rules of substantive law as well as procedure, then he and his military subordinates exercise legislative, executive and judicial powers with respect to those subject to military trials. Such blending of functions in one branch of Government is the objectionable thing which the draftsmen of the Constitution endeavored to prevent by providing for the separation of governmental powers.

> In summary, "it still remains true that military tribunals have not been and probably never can be constituted in such way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts." In part this is attributable to the inherent differences in values and attitudes that separate the military establishment from civilian society. In the military, by necessity, emphasis

---

(1820); *Furman v. Georgia*, 408 U.S. at 452–453, 92 S.Ct. at 2835–36 (Powell, J., dissenting). Additionally, "[t]he Supreme Court is most likely to reject broad delegations of congressional power, typically on statutory grounds, when action of the government agency claiming delegated power touches constitutionally sensitive areas of substantive liberty." Tribe, AMERICAN CONSTITUTIONAL LAW, (2d Edition, 1988) at p. 365. What more constitutionally sensitive area of substantive liberty can there be than an individual's life? *See California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) and cases cited in n. 9, *e.g., Eddings v. Oklahoma*, 455 U.S. 104, 117–8, 102 S.Ct. 869, 877–8, 71 L.Ed.2d 1 (1982).

**16.** In *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911), the Supreme Court upheld the action of the Secretary of Agriculture's use of his legislatively delegated powers in making criminal the violation of rules and regulations made and promulgated by him under the authority of a statute covering forest reservations. The Court reiterated that only Congress can legislate and quoting its previous opinion in *Marshall Field and Co. v. Clark*, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892) stated:

> The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, and must therefore be a subject of inquiry and determination outside the halls of legislation.

*Grimaud*, 220 U.S. at 519, 31 S.Ct. at 484, 55 L.Ed. at 569. The Court then explained that while the act of Congress in question did not expressly declare the particular activity in question unlawful, the statutes involved did have encompassing terms and expressly stated that failure to comply with the rules and regulations of the Secretary would subject the offender to the penalty imposed by Congress.

must be placed on the security and order of the group rather than on the value and integrity of the individual. (Footnotes omitted). The President's authority as head of the executive branch and as Commander-in-Chief is, therefore, not unfettered authority.

See also *Industrial Union Department, AFL-CIO v. American Petroleum Institute,* 448 U.S. 607, 671, 100 S.Ct. 2844, 2878, 65 L.Ed.2d 1010, 1052 (1980); *Textile Manufacturers Institute, Inc. v. Donovan,* 452 U.S. 490, 543, 101 S.Ct. 2478, 2507, 69 L.Ed.2d 185, 222 (1981).

Using these principles to analyze the authority of the President by virtue of Article 36 to promulgate R.C.M. 1004, we must address two issues. First, anticipating that the Supreme Court's recognition that there are "inherent differences in values and attitudes [which] exist that separate the military establishment from the civilian society" might be considered a means by which the President could be "inferred" to understand "the intent" of Congress and thus allow him, under the rubric of his special relationship with Congress, to effectuate *Furman-Gregg* criteria for the imposition of the death penalty, let us examine Article 118 to see if there are inherent differences that would separate the former from the latter. In other words, do inherent differences in values and attitudes exist that separate the military from the civilian community such that imposition of the death penalty in the former and not the latter is constitutionally permissible? I have no doubt that they do. But, I do doubt, that the differences, at least during peacetime,

are so inherent that Congress need not itself establish *Furman-Gregg* criteria.[17]

I am not at all certain that murder, at least the two types of murder that concern us in appellant's case,[18] or even the particular circumstances surrounding the commission of that offense by this particular appellant as alleged, including the aggravating factors plead and found in the charge and specifications, identify any values or attitudes so different as to separate the military establishment from the civilian society. In fact, I believe the Court of Military Appeals has already addressed this issue.

In *United States v. Matthews,* 16 M.J. at 354, the Court recognized that circumstances might exist which would permit rules governing capital punishment to be different from those applicable to civilians. But, in Matthews' situation, the murder and rape of a civilian dependent, offenses which the court was unable to relate to military exigencies, the Court found:

> [N]o reason why Matthews should be executed for his [crimes] if the sentencing procedures used by the court-martial failed to meet the standards established by the Supreme Court for sentencing in capital cases in civilian courts. There is no military necessity for such a distinction; and we do not believe that applying lower standards in this case would conform to the intent of Article 55 or of the Eighth Amendment.

*Matthews,* 16 M.J. at 369.[19] The only difference between Matthews and appellant is that the President has since promulgated R.C.M. 1004. Otherwise, the offense of murder is the same.[20] Thus, I do not be-

---

**17.** On the other hand, if we could identify a difference in values and attitudes, then, maybe, Presidential action in establishing the aggravating factors in R.C.M. 1004(c) would be justified.

**18.** Premeditated murder (Article 118(1)) and murder during the commission of a felony (Article 118(4)).

**19.** Recognizing that the Court of Military Appeals made this statement in applying the principle to the issue of cruel and unusual punishment rather than a delegation of power issue, it would seem to me that the same type of justification would have to be used under an equal

protection argument if proper authority did establish procedures for imposition of the death penalty for service members that differed from that of their civilian counterparts. I do not address, therefore, the issue of whether military status alone is sufficient to overcome any equal protection arguments to permit the imposition of the death penalty on service members and not civilians for offenses committed under the same nine similar circumstances.

**20.** One could argue that the primary victim in appellant's case is his officer-in-charge and his dependent civilian wife while Matthews murdered a civilian dependent of an Army officer.

lieve that sufficient differentiating values and attitudes have been adequately identified, let alone identified as inherent, to permit the death penalty to be effectuated by the President rather than by the Congress.

## IV.

## Is There A Proper Delegation?

Even if, based on the facts of this particular case, those differentiating values and attitudes are identified adequately and are inherent to the military, the process by which that identification is validated must be by a proper delegation.[21] There is nothing in the congressional delegation in Article 36, UCMJ, that can be pointed to that would demonstrate that the identification of the differentiating values and attitudes was proper. *See United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *O'Neal v. United States*, 140 F.2d 908 (6th Cir.1944).

It may well be true that the standards set forth in R.C.M. 1004 meet the guidelines set forth in *Gregg v. Georgia*, 428 U.S. at 153, 96 S.Ct. at 2909, *e.g.*, aggravating factors and procedural safeguards are present; and, it would appear that the concerns of the Court of Military Appeals have been eliminated. But, the President's arbitrary promulgation of such rules without guidance from the legislature that results in the effectuation of an otherwise unconstitutional statutory provision is not a proper application of the delegation process. *See The Aurora v. United States*, 11 U.S. 382, 7 Cranch 382, 3 L.Ed. 378 (1813). In the numerous cases cited by the Supreme Court since *Aurora*, those that upheld a

statutory delegation on grounds that the acts complained of were not a result of improper delegation, were based on statutes that had provided specific guidelines upon which the President was to base his action and which prevented the executive from taking what the courts considered arbitrary action; and, most importantly, the President or a member of the executive branch took his action in accordance with those statutory guidelines. *See, e.g., Union Bridge Co. v. United States*, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523 (1907); *Marshall Field and Co. v. Clark*, 143 U.S. at 649, 12 S.Ct. at 495; *United States v. Gordon*, 580 F.2d 827 (5th Cir.1978); *United States v. Pastor*, 557 F.2d 930 (2d Cir. 1977). *See also* Annotation, "Validity of Statute or Ordinance Vesting Discretion in Public Officials without Prescribing a Rule of Action," 92 A.L.R. 400; Annotation, "Validity of Delegation to Drug Enforcement Administration of Authority to Schedule or Reschedule Drugs Subject to Controlled Substances Act (21 U.S.C. §§ 801 et seq.)," 47 A.L.R.Fed. 869.

In *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the Supreme Court established a three-stepped analysis to determine whether the President's authority, exercised in light of a congressional delegation, was too broad:

> ... we look to the statute to see whether the Congress has declared a policy with respect to that subject, whether the Congress has set up a standard for the President's action, whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition.

Congress was endowed with the authority "to make rules and regulations for the governing" of the armed services, the Congress legislates and the President, as head of the executive branch and as commander in chief of the armed forces, enforces that legislation. Where Congress has failed to express an intent to require certain action, *e.g.*, require the taking of an oath to demonstrate bona fides at the time of submission of an application to an executive agency, the executive could not then prescribe that violation of the requirement would result in criminal penalty. *Williamson v. United States*, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278 (1907).

---

The status of appellant's victim as officer-in-charge could have been one of the aggravating factors under the President's scheme but was not plead. Thus, the victim's officer status, which might have created that military significance, was not used by the Government at trial and cannot now be used as a means to differentiate appellant's case from Matthews' situation on the basis of a special need of the military.

**21.** As we have previously noted, the military justice system is dependent upon both the legislative and executive branch for its creation and effectuation. *See* Footnote 14. Therefore, since

293 U.S. at 415, 55 S.Ct. at 246, 79 L.Ed. at 456. The Supreme Court recently breathed new life into *Panama* in the realm of criminal punishments. *Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Using *Panama's* three-stepped analysis as recently applied by *Mistretta,* I find Articles 36, 56, and 118 itself so deficient that reliance on an Article 36 delegation as a proper congressional delegation to the President for effectuating guidelines that would authorize the imposition of the death penalty within the military justice system is misplaced and improper. This is particularly so when such a delegation relates to the imposition of the supreme and ultimate penalty.[22]

First, I do not believe that Congress has set a policy with regard to the imposition of the death penalty for Article 118 since *Furman.* In fact, the only offenses for which the Congress has been able to obtain a consensus for imposition of the death penalty in appropriate circumstances have been in connection with air piracy [49 U.S.C.A. §§ 1472(i)(1)(B), 1472(n)(1)(B) ] and espionage by military personnel [Article 106a, UCMJ, 10 U.S.C. § 906a]. *See Gubiensio–Ortiz v. Kanahele,* 857 F.2d 1245 (9th Cir. 1988); *see also Thompson v. Oklahoma,* —— U.S. ——, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring in judgment). My failure to presume that Congress has set a general death penalty policy is also based on recognition of the public controversy surrounding capital punishment, at least as to some offenses, and the reluctance of the federal courts and the United States Sentencing Commission to presume the will of Congress in light of possible adverse congressional reaction. *See Gubiensio–Ortiz,* 857 F.2d at 1256.

Second, I do not believe that we can presume, as the majority would have us, that because of a presidential reporting requirement, the Congress has given tacit approval or has ratified the presidential promulgation of R.C.M. 1004. The Supreme Court has clearly stated that when

"substantial restraints are being placed on constitutional procedures" and they are "in conflict with our long-accepted notions of fair procedures, such action must be based upon explicit, not implicit, authority. Such decisions cannot be assumed by acquiescence or non-action." *Greene v. McElroy,* 360 U.S. 474, 507, 79 S.Ct. 1400, 1419, 3 L.Ed.2d 1377, 1396–97 (1959). The *Greene* Court further enunciated the significance of explicit action on the part of Congress:

> They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized (citation omitted), but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with the authority to decide them.

*Id.* at 507, 79 S.Ct. at 1419, 3 L.Ed.2d at 1397.

In *Greene v. McElroy,* the petitioner's work opportunities were being severely limited by the Department of Defense without affording him a hearing that comported with "our traditional ideas of fair procedures." In appellant's case, he is being subjected to the imposition of the death penalty without being afforded the constitutional assurance that imposition of such an extreme penalty is a current policy adopted by the branch of government established to determine such policy.

Thus, I conclude that Congress has not set a policy with regard to imposition of capital punishment in the military justice system since *Furman.* I further conclude, upon examination of Article 36, that no standards were set by the Congress with regard to what factors the President should apply in determining when the imposition of the death penalty would be autho-

---

**22.** And, it is only to the imposition of the death penalty that my dissent applies. I offer no comment on the validity of the delegation with regards to other matters that may arise within the military justice system at a later time.

rized. As to the third step in a *Panama* analysis, I could conclude that the Presidential finding requirement has been met, since only the President can order the punishment of death executed. R.C.M. 1207; *see* Article 71(a), UCMJ. Therefore, having failed to meet two of the three steps required by *Panama*, I find that the President's authorization of imposition of capital punishment pursuant to findings made in accordance with R.C.M. 1004 is based upon an unconstitutional delegation of authority.

## V.

### Limitation Of Article 36, UCMJ

Throwing caution to the winds, however, let's do some further analysis by assuming that Congress did establish a death penalty policy, at least with respect to Article 118, and did intend to delegate to the President under Article 36, UCMJ, the ability to correct provisions of the UCMJ held ineffectual until the *Furman* mandate was complied with. The congressional delegation must still be examined because it must be capable of proper application by the President. In order to ensure that proper application, the delegation must establish certain standards for the President to follow when he acts pursuant to the delegation.[23]

I find that the standards enunciated by Congress are either non-existent or very restrictive. When one examines the judicial opinions addressing delegation after *Panama*, and in particular when one exam-

ines the delegation by Congress to the Sentencing Commission, as described at great length in *Mistretta*, one finds the standards enunciated by the Congress must be specific and detailed.[24]

Looking at Article 36, however, I fail to find such specific and detailed standards. I do find that the matters which Congress delegated to the President are very general and involve matters of procedure, not matters involving substantive law.[25] *Ellis v. Jacob*, 26 M.J. 90 (C.M.A.1988); *United States v. Frederick*, 3 M.J. 230 (C.M.A. 1977). This fact provides another ground for my conclusion that R.C.M. 1004 is an improper basis upon which to authorize imposition of the death penalty.

The aggravating factors set forth in R.C.M. 1004(c) are matters of substantive law and not procedure. Two Supreme Court opinions serve as the judicial authority for this conclusionary statement. *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) and *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

In *Bullington* the Supreme Court referred to the Missouri statute that enacted death penalty legislation after the *Furman* decision as containing "substantive standards to guide the discretion of the sentencer" and affording "procedural safeguards to the convicted defendant." 451 U.S. at 433, 101 S.Ct. at 1853, 68 L.Ed.2d at 275.[26] The statute that the *Bullington*

---

**23.** For example, compare Article 36, UCMJ (quoted *infra*) with the Federal Sentencing Commission Act wherein the Congress set forth categories for determining offenses, categories for determining categories of defendants, four purposes, three goals, and a specific tool, etc. *See Gubiensio–Ortiz v. Kanahele*, 857 F.2d at 1245, *see also* Annotation, "Validity of Delegation to Drug Enforcement Administration of Authority to Schedule or Reschedule Drugs Subject to Controlled Substances Act (21 USC §§ 801 et seq.)," 47 ALR Fed 869.

**24.** Sentencing Reform Act of 1984, as amended 18 U.S.C. § 3551 *et seq.* (1982 ed., Supp. IV), and 28 U.S.C. §§ 991–998 (1982 ed., Supp. IV).

**25.** While we believe rules of evidence involve substantive law, the congressional delegation is a little more specific in that it directs the President to adopt rules that apply to trials in federal

district courts—which we recognize as the Federal Rules of Evidence, rules enacted by the Congress, and upon which the Military Rules of Evidence were based, with some modification, due to the needs of the military law practice. Appendix 22, Analysis, MCM, 1984.

**26.** I disagree with the Government's contention and the majority's interpretation that the Supreme Court considered the aggravating factors procedural matters in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The *Dobbert* Supreme Court was addressing the factual situation involving a change in the role of the judge and jury in the imposition of the death penalty. I agree that the change in the roles made by the Florida legislature involved procedural matters; but, a determination that a change in role is procedural is far different from determining that the identification of cer-

court examined had two separate provisions. One addressed purely procedural issues, such as the requirement for a bifurcated trial, the jury's requirement to hear additional evidence in extenuation, mitigation, and aggravation. Additionally, this provision provided the judge with guidelines as to what he was to instruct the jury and his role in the proceedings after jury had made its decision. The second provision of the statute dealt with the legislature's specification of 10 aggravating and 7 mitigating circumstances which the jury had to find in writing and be convinced beyond a reasonable doubt that "any aggravating circumstance or circumstances that it finds to exist are sufficient to warrant imposition of the death penalty." *Bullington*, 451 U.S. at 434, 101 S.Ct. at 1853, 68 L.Ed.2d at 276. After careful analysis of *Bullington*, I believe the Court's "procedure" label—as interpreted by appellate Government counsel in their argument before this court—was meant to apply to the change in procedure caused by the new legislation, *i.e.*, the new state statute gave the jury rather than the judge the responsibility for determining the presence of the statutorily created aggravating factors. The Court's "procedure" label had nothing to do with the establishment of the aggravating factors themselves. I base this conclusion on the fact that the Court expounded on its determination that the provisions of the statute almost equated to a trial on the merits, particularly with the use of the beyond a reasonable doubt standard. "By enacting a capital sentencing

procedure that resembles a trial on the issue of guilt or innocence, however, Missouri explicitly requires the jury to determine whether the prosecution has 'proved its case.'" 451 U.S. at 444, 101 S.Ct. at 1858, 68 L.Ed.2d at 282. As a result the Court stated that "it is the State, not the defendant, that should bear 'almost the entire risk of error.'" 451 U.S. at 446, 101 S.Ct. at 1859, 68 L.Ed.2d at 283. It thus held that the State was not entitled, at defendant's second trial, to attempt to prove the aggravating factors it had failed to prove at his first sentencing hearing since he had, in reality, been found not guilty beyond a reasonable doubt of those aggravating factors. R.C.M. 1004 is almost identical to that Missouri statute, except for the specific aggravating and mitigating factors listed in the Missouri statute. Indeed, the Ninth Circuit Court of Appeals, *en banc*, recently held that Arizona's statute requiring the finding of aggravating factors beyond a reasonable doubt was unconstitutional because it placed with the trial judge the duty of finding the aggravating factor when it should have been the duty of the jury. The Court determined it should be the jury's decision because the aggravating factors were like elements of the offense. As such the defendant was entitled, in light of the Sixth Amendment, to a jury determination of the existence of those aggravating factors. *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988).

In *California v. Ramos*, Justice O'Connor, writing for a majority Court explained

tain factors are sufficiently aggravating as to make an individual eligible for the judge or jury to impose the death penalty is also a procedural matter. Additionally, the Florida statute had previously passed constitutional muster, both as to the aggravating factors to be considered and the procedural application of determining the presence of aggravating factors before imposition of the death penalty was authorized *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, *reh'g den.*, 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976).

Additionally, the Florida statute, which not only changed the role of judge and jury, but also identified aggravating factors which had to be found before the death penalty could be imposed, was enacted by the legislature and not by

someone in the executive acting under a delegation of authority. Thus, no separation of powers—improper delegation or usurpation of authority—issue was or could be raised by the defendant in *Dobbert*. The only issue of concern for the Court was whether the change in the Florida statute violated *ex post facto* principles. The statutory changes served to ameliorate the appellant's potential for imposition of the death penalty because it provided "significantly more safeguards to the defendant than did the old.... Hence, viewing the totality of the procedural changes wrought by the new statute, we conclude that the new statute did not work an onerous application of an *ex post facto* change in the law." 432 U.S. at 295–6, 97 S.Ct. at 2301, 53 L.Ed.2d at 358.

the Court's present interpretation of *Gregg:*

> In *Gregg* itself, the joint opinion of Justices STEWART, POWELL and STEVENS concluded that the Georgia sentencing scheme met the concerns of *Furman* by providing a bifurcated proceeding, instruction on the factors to be considered, and meaningful appellate review of each death sentence. (citation omitted.) Satisfied that these *procedural* (emphasis added) safeguards "suitably directed and limited" the jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action," (citation omitted), the joint opinion did not undertake to dictate to the State the particular *substantive* (emphasis added) factors that should be deemed relevant to the capital sentencing decision. Indeed, the joint opinion observed: "It seems clear that the problem [of channeling jury discretion] will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." (Citation omitted.) ("The deference we owe to the decisions of the state legislatures under our federal system ... is enhanced where the specification of punishments is concerned, for 'these are peculiarly questions of legislative policy' "). (Footnote: Moreover, in approving the sentencing schemes of Georgia, Florida, and Texas, the joint opinions of Justices Stewart, POWELL, and STEVENS did not substitute their views for those of the state legislatures as to the particular *substantive* (emphasis added) factors chosen to narrow the class of defendants eligible for the death penalty....)
>
> It would be erroneous to suggest, however, that the Court has imposed no *substantive* (emphasis added) imitations on the particular factors that a capital sentencing jury may consider in determining whether death is appropriate.

463 U.S. at 1000, 103 S.Ct. at 3452–53, 77 L.Ed.2d at 1180.

The majority states that Article 36 "clearly delineates the general policy to prescribe pretrial, trial, and post-trial procedures for cases tried by courts-martial," and "clearly states that the authority is delegated to the President," and "does establish specific boundaries to limit the President's action under this provision" because the President "is bound to apply the principles of law recognized in criminal trials in the United States district courts." While I agree with that statement as far as it goes, the statement is flawed in that the United States district courts have no capital punishment principles to apply. Congress has not passed any federal legislation establishing *Furman*-type factors for federal capital offenses in general, but has for the specific crimes of aircraft piracy and espionage by military personnel; but in doing so, specified the aggravating factor(s) that had to be found before death could be imposed.

Although the United States district courts must follow the *Furman* mandate when interpreting capital punishment statutes, as must we, the district courts—despite the validity or invalidity of any substantive-procedural distinctions—cannot establish the aggravating factors where none have been enacted by the Congress. *See United States v. Harper*, 729 F.2d 1216 (9th Cir.1984). Likewise, if a federal district court cannot effectuate an unconstitutional death penalty provision, neither can the President, pursuant to Article 36, which requires him to follow, insofar as practicable, the principles of law recognized in trials of criminal cases in United States district courts. Article 36, UCMJ.

Furthermore, Article 36's delegation is additionally limited by Article 56, UCMJ, for while giving authority to the President to prescribe maximum punishments, it does so in terms of non-capital offenses. That the President's authority to prescribe maximum punishments is limited to non-capital offenses is supported not only by the legislative history of Article 56 but in fact by the President's own past actions.[27] Since

**27.** I recognize that the Court of Military Appeals

in *United States v. Flucas,* 23 U.S.C.M.A. 274,

**1112**

the inception of the UCMJ and the promulgation of the first Manual for Courts-Martial, the provisions relating to the maximum punishments authorized for particular offenses—the Table of Maximum Punishments in MCM 1951 and 1969—have never addressed the punishments authorized for those offenses described in the various articles that authorize the imposition of the death penalty, even where life imprisonment is a mandatory lesser sentence. Therefore, since offenses carrying the death penalty are capital offenses, the President does not have the authority to prescribe anything which might effect the maximums with regard to Article 118, most particularly the aggravating factors that determine whether one convicted of a capital offense is eligible for consideration of imposition of the death penalty. If the President could prescribe the aggravating factors which make a person eligible for imposition of the death penalty, he would place a maximum on all other situations wherein a death occurs as the result of a criminal act for which Congress has authorized the death penalty. He would thus act contrary to congressional intent and his authority under Article 56. *See Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *United States v. United Verde,* 196 U.S. at 207, 25 S.Ct. at 222; *United States v. McCormick,* 12 U.S.C. M.A. 26, 30 C.M.R. 26 (1960). While it is true that such an action accrues to the

benefit of some capital offenders, without the proper authority or specific guidance of Congress, the President not only usurps authority but places other capital offenders in jeopardy when Congress may not have intended such unequal classification.[28]

A further indication that Congress and not the President is the proper authority for prescribing the aggravating factors, and a recognition by Congress of its responsibilities in this arena, is the 1986 enactment of Article 106a, 10 U.S.C. § 906a. Not only did Congress establish espionage as a capital offense, it also set forth within the statute itself, the aggravating factors that had to be found before imposition of the death penalty could be adjudged.[29] In that statute the Congress further delegated to the President the authority to prescribe other aggravating factors under Article 36.[30]

### VI.

#### Summary

In summary, I find that the Article 118 provision authorizing the imposition of the death penalty is unconstitutional and therefore invalid because of *Furman* and its progeny. I further find that the President's attempt in 1984 to effectuate that invalid authorization by promulgation of the aggravating factors set forth in R.C.M. 1004(c) pursuant to the authority vested in

275, 49 C.M.R. 449, 450 (1975), held that the President acted with proper authority when, pursuant to Article 36, UCMJ, he established the "element" of knowledge for the offense of assault, he provided "an aggravating factor increasing the maximum permissible punishment 'when the victim has a particular status or is performing a special function.' Paragraph 207b, MCM 1969." I can, however, distinguish *Flucas* on one simple ground—the death penalty is so unique that it requires different treatment. As Justice Stewart stated in his concurring opinion in *Furman,* 408 U.S. at 306, 92 S.Ct. at 2760, 33 L.Ed.2d at 388:

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

*See* Dix, "Appellate Review of the Decision to Impose Death," 68 Geo.L.J. 97, 109 (1979).

Additionally, the punishment statute—Article 56—is clear on its face and it does not pertain to the death penalty. Thus, the principles of strict statutory construction apply. *United States v. Jenkins,* 7 U.S.C.M.A. 261, 262, 22 C.M.R. 51, 52 (1956).

**28.** I also make no judgment on equal protection of the law questions such as that posed by appellant. I find it unnecessary to my resolution of this case.

**29.** If Congress had tacitly approved or ratified R.C.M. 1004, as offered by the majority, why was it necessary for the Congress to set forth specific aggravating factors for Article 106a, UCMJ, a post-*Furman* statute?

**30.** The propriety of that additional delegation is a matter for future resolution, if necessary.

him by Articles 36 and 56, as they presently exist, was ineffectual because such delegation was constitutionally impermissible in the first place, or was an improper delegation by the Congress in the second.

Accordingly, while I approve the findings, I would disapprove the death penalty as approved on review below as a matter of law and approve only so much of the sentence as provides for dishonorable discharge, life imprisonment, forfeitures of all pay and allowances and reduction to pay grade E–1.